1

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

-oOo-

In Re:                          ) Case No. 2:23-Bk-15574-NB  )
                                ) Chapter 15                )
                                )                           )
ALEKSANDR VITALIEVICH           ) Los Angeles, California   )
SABADASH,                       ) Tuesday, November 14, 2023 )
                                ) 2:00 PM                    )
                                )                           )
                      Debtor.   ) #8.00 HRG RE: APPLICATION FOR
                                ) RECOGNITION OF FOREIGN MAIN
                                ) PROCEEDING, OR IN THE
                                ) ALTERNATIVE, FOR RECOGNITION
_____    ) OF FOREIGN NONMAIN PROCEEDING
                                ) AND CERTAIN RELATED RELIEF
                                )
In Re:                          ) #9.00 STATUS CONFERENCE RE:
                                ) RECOGNITION OF A FOREIGN
                                ) PROCEEDING
GOLDEN SPHINX LIMITED,          )
                                ) Case No. 2:22-Bk-14320-NB
                                )
                      Debtor.   ) #7.00 Status conference
_____    )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE NEIL BASON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:
For the Debtor, Aleksandr    KEITH C. OWENS, ESQ.
Vitalievich Sabadash:        Fox Rothschild LLP
                              10250 Constellation Boulevard
                              Suite 900
                              Los Angeles, CA 90067
                              (310)598-4150

                             MICHAEL ZORKIN, ESQ.
                              The Zorkin Firm
                              6320 Canoga Avenue
                              15th Floor
                              Woodland Hills, CA 91367
                              (323)493-8075

2

For Alexander Ivanovich        SCHUYLER G. CARROLL, ESQ.
Gavva, Foreign                 ALEX STOLYAR, ESQ.
Representative:                 Loeb & Loeb LLP
                                 10100 Santa Monica Boulevard
                                 Suite 2200
                                 Los Angeles, CA 90067
                                 (310)282-2000


For Alexander Adam and         RONALD HOWARD, ESQ.
Andrew Wood, Foreign           (Telephonically)
Representatives to Golden      Togut, Segal & Segal LLP
Sphinx Limited:                One Penn Plaza
                                 Suite 3335
                                 New York, NY 10119
                                 (212)594-5000


Court Recorder:                DINA G. JOHNSON
                               United States Bankruptcy Court
                               Edward R. Roybal Federal Building
                               255 East Temple Street
                               Room 940
                               Los Angeles, CA 90012
                               (855)460-9641

Transcriber:                   SHARONA SHAPIRO
                               eScribers, LLC
                               7227 N. 16th Street
                               Suite #207
                               Phoenix, AZ 85020
                               (800) 257-0885

Proceedings recorded by electronic sound recording;
transcript provided by transcription service.

3

LOS ANGELES, CALIFORNIA, TUESDAY, NOVEMBER 14, 2023, 2:49 PM

-oOo-

(Call to order of the Court.)

THE COURT:  All right.  That brings us to calendars 7 through 9, the Golden Sphinx status conference, and the Sabadash status conference, and the motion for recognition.

And so let me start with appearances.  Let's see, for the foreign representative in the Sabadash matter, Mr. Gavva, I'll take appearances there first.

MR. CARROLL:  Good afternoon, Your Honor.  Schuyler Carroll and Alex Stolyar of Loeb & Loeb.

THE COURT:  Thank you.

MR. CARROLL:  Thank you.

THE COURT:  Just one moment.  For Mr. Sabadash?

MR. OWENS:  Good afternoon, Your Honor.  Keith Owens of Fox Rothschild.  And I'm here with my colleague Michael Zorkin of the Zorkin law firm.  We represent Mr. Sabadash.

THE COURT:  Thank you.

Let's see, online, we have Mr. Howard.

MR. HOWARD:  Good afternoon, Your Honor.  Ronald Howard, of Togut, Segal & Segal, on behalf of Andy Wood and Alexander Adam, the foreign representatives of Golden Sphinx Limited.

THE COURT:  Thank you.  Do we have anyone for Mr. Itkin?

4

Any other parties who wish to state an appearance?

All right.  No response on that.

Okay.  So as set forth in the second posting of the tentative rulings, I intended to -- please be seated -- I intended give you an oral tentative ruling, and I'm happy to do that.  But I try to always remember to check and make sure that I'm not messing anything up by doing that.  Have the parties reached any resolution?

MR. CARROLL:  We have not, Your Honor.

THE COURT:  Okay.  Thank you. So I'll give this to you in several parts.  And I want to start by recognizing several things.  First of all, partly due to the nature of how this case came up, in that it was transferred to me, and partly due to my own personal schedule, I cannot claim to have read every piece of paper, every page.

But I have reviewed the points of authorities, I've reviewed the arguments, I've reviewed some of the case law. I've discussed the matter with my clerk and so on.  So I'm prepared, but I am not quite as on top of it as I normally pride myself on being.  So I really am giving oral tentative rulings.  These are not final rulings that I can't be talked out of.

Next, let me mention that there are a lot of matters happening in various news outlets, or non-news outlets, that could influence someone's view of the trustworthiness of

5

proceedings in Russia.  And there are intimations in the papers about who -- if not outright statements -- about who is in or out of favor with the powers that be.  And the word oligarch has been used.  And of course there's the assertion, that nobody has contested, that Mr. Sabadash is in jail.  But there are contested assertions, I think, about the cause for that.

So there are a lot of controversial topics swirling around this issue.  But as always, I try to stick to what the parties have presented in the papers and not pay attention to anything outside of that.  And my standard admonition to the law clerks is, if there's a dispute about the value of real estate, for example, don't go look it up on Google Maps and take a look at the picture there, because that's not in the record and it might not be accurate about the current state or the state at the relevant time and so on.

So same principle here.  I'm sticking with what the parties have presented to me except where I feel it's appropriate for me to take judicial notice.

Okay.  So with that prelude, I think, on many issues, I would be inclined to favor, under the traditional analysis of these sorts of things, Mr. Gavva's position.  But on one issue, in particular, I think I'd be inclined to favor Mr. Sabadash's position and hence deny the petition for recognition.

And the issue I've got there is the public policy exception, which, admittedly, is a narrow exception.  And the

6

case law, some of which I'm bound to follow, and other of which is persuasive, all favors a very narrow interpretation of the public policy exception.

But we've got a couple of Russian banks who are creditors here.  And funds that would go to Russian banks, at this time, when the policy of the federal government of the United States is not complete isolation of Russia, or complete cessation of all commerce, but still pretty draconian attempts at cutting off funds flowing to Russian banks.  It seems to me that probably meets the standard, the high standard, for the public policy exception.  And I can get into more details about that, but that is the gist of my oral tentative ruling on that issue.

Now, let me touch on some other issues.  It seems to me that, when it comes to the standing of Mr. Gavva, whether he has authorization to proceed in the way that he's proceeding and to appear in this court, I think, based on the quoted portions of the Russian courts, the Moscow court's rulings, he probably does have standing to appear.

MR. HOWARD:  Your Honor, it might be me, but I think your mic has cut out.

THE COURT:  Oh.  I'll bring that a little closer, but can you hear now okay?  Okay.

MR. HOWARD:  Yes, sir.

THE COURT:  And let me know if you need me to recap

7

anything there.  Mr. Howard?

MR. HOWARD:  Your Honor, maybe just the last ten seconds.

THE COURT:  Okay.  So I had indicated that, so far as Mr. Gavva's standing, it seems to me that the Russian court, the Moscow court's orders probably are sufficient to give him standing in this matter.  Even though perhaps the Moscow court did not cite the right -- the section that should have technically been cited, it seems to me the gist of it was to probably give him standing for the reasons set forth in his papers.

So as to the good or bad-faith issues, it seems to me there's no clear evidence, there's no sufficient evidence to determine that either side is -- on this record, that there is bad faith on either side.  There are certainly assertions that Mr. Sabadash is someone who has engaged in wrongful activity.  There's also assertions that that's true of the other side, or at least of the creditors who are involved.  And there are other allegations about what's happened in the course of the parties' numerous parts of litigation in lots of different fora.  But it doesn't seem, to me, to rise to the level of bad faith.

I mentioned about clear evidence.  I probably shouldn't have used that word.  I don't think the standard is clear and convincing.  But in any event, it doesn't seem to me

8

that there is enough evidence of a lack of good faith on either side, at this point, on this record.  So I mean, I'm couching that in a lot of ways because this is not an evidentiary hearing; we've just got general allegations.

But when it comes to -- I don't have -- there was another issue that I wanted to touch on here.  Oh, right, the judicial estoppel argument.  It seems to me that the arguments for Mr. Gavva are persuasive on that, that we're talking about two different time periods, and that it is not inconsistent to argue, for purposes of service in the divorce proceeding, that Mr. Gavva, at that time, was -- not Mr. Gavva, Mr. Sabadash, at that time, was asserting residence and, as a factual matter, probably was residing here in Beverly Hills and that, at a later time, being arrested and incarcerated in a Russian jail for a number of years, that that would be his location.

When it comes to the center of main interest analysis, and the other different ways of looking at connections the parties put forth in their briefs, such as the location of the creditors, which jurisdiction's law would apply, and so on, I know that Mr. Itkin is a very substantial creditor, if his claim is allowed in full, at least.  The banks have some judgments in their favor, but there are assertions against that that, that's on appeal, and so on.

Depending on which way you look at it, there are some facts that seem to weigh in either direction as to what would

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document   Page 9 of 62
**Aleksandr Vitalievich Sabadash**

9

really be the center of main interest and the location of more creditors one way or the other.  So my oral tentative ruling is not to make a determination on those issues, because I think those are -- that gets into some issues that probably would require more analysis to weigh the location of the creditors, the location of the assets, and so on.

The Beverly Hills mansion, or property, is certainly a very valuable asset, and it's right here.  The factory outside of Moscow is possibly, if the assertions about how the funds are being used are accurate, then perhaps it's actually quite profitable.  But the funds, the profits are being siphoned off, so maybe that's a very valuable asset.  And that's in Russia.  And maybe lots of things to do with that asset are governed by Russian law.  And although it's indirect ownership through several layers, it still seems to me, for a center of main interest analysis, or for the alternative nonmain proceeding analysis, that there's a certain weight of matters that are centered in Russia.

And so the bottom line there, again, is that I don't think I can make a decision, at least today, with the information that I've got, and what I've been able to digest so far.  And possibly, without an evidentiary hearing, I don't think I can make a decision about center of main interest, or alternatively, a nonmain proceeding, applying the factors there.

10

But I don't think I need to get there because, if the public policy exception does apply, then I would not recognize that proceeding anyway because the funds would be going to the Russian banks.

So I know that I haven't touched on everything in the papers, but I wanted to give you a sense of where I'm leaning on all of these things and then hear oral argument.  And then I plan to take it under submission and give you a continued hearing date.  And I would either issue something in writing before then, or I would plan to give you an oral ruling at the continued hearing date.

So because my ultimate disposition in my oral tentative is against Mr. Gavva, why don't I hear from Mr. Carroll or Mr. -- is it Solyar?

MR. STOLYAR:  Stolyar, Your Honor.

THE COURT:  Stolyar.  Would you spell that, please?

MR. STOLYAR:  S as in Sam, T as in Tom, O as in Oscar, L as in Larry, Y as in yellow, A as in Apple, R as in Ricky.

THE COURT:  Thank you very much.  And I think your name was on the papers, but I just hadn't jotted it down.

MR. STOLYAR:  No worries.

THE COURT:  Thank you.

MR. CARROLL:  Thank you, Your Honor.  Schuyler Carroll, of Loeb & Loeb, on behalf of Mr. Gavva.

Your Honor, and I'll direct my comments towards your

11

discussion in the tentative about the public policy.  We believe, Your Honor, that the public policy exception does not apply here.  And we believe that for several reasons.

The first, Your Honor, is that what we're asking for here today is not the disbursement of any funds.  That would only be at a future date.  We are asking for recognition of a Chapter 15 filing only.

And I think that's an important distinction.  And I raise it because, if we look at, I think, the only case that really addressed the issue, Judge Glenn's decision in In re Markus, in the Southern District of New York, he was addressing the issue of disbursement of funds to Russia.  And again, he made a distinction where he said that I would not -- I'm characterizing -- I would not be comfortable allowing funds to be disbursed to Russia, but that does not mean that the funds can't come into the hands of the U.S. agent and be held.

And I think that is similar to what we're asking for here today.  We're not asking for any funds to be distributed in any way.  We're certainly not asking for those funds to be distributed to Russia.  We are solely dealing with recognition.

And if we look at the cases that have addressed the public policy exception with respect to recognition, what those courts say is recognition -- as Your Honor said, the public policy exception should be narrowly construed, and the public policy exception only would apply if the underlying proceeding

12

is somehow against public policy.  And I don't believe that there is any question that the Russian policy is anything less than an opportunity -- gives anything less than a full and fair opportunity for the parties to appear and be heard.

In fact, Mr. Sabadash has repeatedly done that, has filed many motions, has an appeal pending now, and lots of other things that would occur in a litigation here in the U.S. So I don't think the fact of the ultimate creditors of the Russian proceeding being Russian banks does change that analysis.

I think it's also important, Your Honor, and sort of, as we discussed, and Your Honor referred to, in terms of the timing of the judicial estoppel argument, here we're dealing with the timing of recognition which we're asking to be done at the present time.  The potential that monies might ultimately be distributed to Russia and to the Russian -- first, the financial manager in Russia, and then, potentially, ultimately to Russian banks, might happen at some time in the future. That might happen at some time in the future when the existing sanctions are no longer in place.

So I think that it would be premature to judge that issue today and therefore deny recognition, based on something that could happen in the future, and something that could happen in the future at a time when the current state of affairs may or may not apply.

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document     Page 13 of 62
**Aleksandr Vitalievich Sabadash**

13

I think it's also important to understand, Your Honor, the reason we are here.  The reason we are here is because the foreign representative commenced a litigation in California state court.  Mr. Sabadash moved to dismiss that, filed a demurrer in California state court, saying that the foreign representative was not entitled to bring that action absent the filing of a Chapter 15 proceeding.

So the purpose of our coming to this Court, and our filing the application for recognition, is to answer that complaint by Mr. Sabadash, and that decision by the state court, to obtain the authority to continue that action, not to collect any assets, not to distribute any assets to Russia, or the Russian banks, or anywhere else.

I think, Your Honor, it's also important to consider that, as I mentioned with Judge Glenn's decision, he did not address recognition.  And there is no case that has denied recognition of a Russian proceeding because of the public policy exception.

And what Judge Glenn did, in that respect, is also important because, under Section 1518, the Court has -- actually, the foreign representative has the requirement to inform the Court of any basis that would affect recognition. And so Judge Glenn had before him the opportunity, using 1518, to dismiss the case that was before him, or to -- I'll use an inartful word -- ungrant recognition that had been previously

14

granted.

But he didn't do either one of those things.  I think that if the Court were to -- if Judge Glenn were to have believed and followed the authority or the thinking that you laid out in the tentative, he would have done that.  So I think that is -- and as you said, that is only persuasive; it is not binding on this Court.  But I think it is a well-reasoned decision on why this Court should not deny recognition based on the public policy exception.

I certainly could get into any of the other issues, Your Honor, but I think, from hearing your oral tentative, it probably makes more sense for me to cede the podium, unless Your Honor has questions, of course.

THE COURT:  I think that's probably right.  I'm trying to keep an open mind on all of the issues.  And I'm also trying to keep in mind the limited time.  And I do recognize the arguments that were made in the papers.  So unless there's some particular point that you want to highlight for me, I think I can address all of the other issues by reviewing the papers again and noodling a little bit more on that.  Thank you.

MR. CARROLL:  Very well, Your Honor.  Thank you.

THE COURT:  Mr. Owens?

MR. OWENS:  So Your Honor, I'd like to address all of the issues, because most of them, in fact, sort of, are against our position.

15

With respect to the public policy issue, we do agree with Your Honor.  I will just say that this is a relatively new situation.  I mean, the Ukraine war just happened in 2022.  So there haven't been cases that have come down, other than the case that's pending before Judge Glenn, where he said, look -- I mean, it is true he said I will not agree to release any of these funds to Russia.

But as far as we're aware -- and we've submitted a declaration from an expert -- we're not aware of any case -- well, let me step back.  We are aware of many cases in Russia where, due to the war in Ukraine and the characterization or status of the U.S. as an unfriendly state, since that war, no Russian proceedings have recognized enforcement of U.S. judgments, even bankruptcy decisions, bankruptcy trustees seeking to enforce a judgment or an action in Russia.

So there's certainly a reciprocity issue.  A number of cases are cited in the expert's declaration.  And that's one part of the equation.  The second part of the equation is what about U.S. bankruptcy courts?  And the issue there is really a matter of the public policy exception.  And I would just like to take a second to cite to the standard, because the thing that the Court needs to look at is whether recognition would severely impinge the value and import of United States statutory Constitutional rights such that granting comity would severely hinder the United States Bankruptcy Court's ability to

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document     Page 16 of 62
**Aleksandr Vitalievich Sabadash**

16

carry out the most fundamental policies and purposes of these rights.

Well, I mean, it can't get more fundamental than the U.S. is trying to thwart Russia's invasion of Ukraine and cut off funds.  You have banks that are -- essentially, the only two creditors in the Russian bankruptcy proceedings -- that are beneficiaries of this judgment where Mr. Gavva is pursuing collection actions.  That was the whole purpose of the state court proceeding was to pursue enforcement of the judgment in the U.S.

They tried it in California.  They were unsuccessful only because the judge determined that they didn't have standing, Mr. Gavva didn't have standing because he wasn't a representative of the banks themselves.  And they decided to avail themselves of this jurisdiction, of the U.S. bankruptcy court, to take a shot.

But we agree with Your Honor with respect to public policy.  This is very fluid.  The U.S. has sanctioned Russian banks.  Russia is sanctioning U.S. businesses as well.  There's no access to Russian courts anymore with respect to commercial activities.  And so we would argue, again, that Your Honor is correct, that the public policy exception does apply.

I'd like to address some of the other arguments, if I may.

THE COURT:  Go ahead.

17

MR. OWENS:  So we've made four substantive arguments. One of them I've already talked about, the standing issue, that Mr. Gavva lacks standing to commence a Chapter 15 bankruptcy petition, because he didn't obtain the requisite authority from the Russian court that appointed him as a financial manager.

And so the Court in Russia, in the initial -- the December -- the '22 decision or ruling that is cited by Mr. Gavva, the Court specifically addressed whether Mr. Gavva could retain an agent to assist.  It was an employment application. And it was limited, by statute, to a certain amount, a certain threshold where fees could be paid and you had to get court approval to pay the fees.

And so that employment application authorized Mr. Gavva to retain and -- bear with me for one minute, Your Honor. I will give you the exact -- I want to give you the quote.  All right.  Here we go.  So we're talking about the October 11th ruling.  And that's at docket number 33.  That's attached to Professor  Asoskov's declaration.  And he states that it authorized Mr. Gavva to hire Mr. Dupak, okay, as a contractor to render certain services, including searching for assets.

And again, to put it in context, it's no different than, in a bankruptcy case, where you have a bankruptcy trustee that files an application to employ a field agent or some sort of professional to assist in locating assets.  It did not give the authority to Mr. Gavva to start collecting and enforcing

18

judgments in the United States.  That's not what it did.

There is language that's cited in the October 11th ruling that's taken directly from the terms of the employment application.  It simply recites the duties to which Mr. Dupak, who's not a party to this action, is being retained.

And Mr. Kirpichev, who is their expert, highlights the quoted language from the draft service agreement.  But that's the language you're reading, Your Honor.  It's basically a rendition or a recital of what the court was approving, the employment of Mr. Dupak, not the court giving Mr. Gavva the right to do anything other than to retain him.

So realizing they had a problem, they decided to seek a clarification order.  And the order that they sought was a subsequent order.  It is dated -- let's see.  I don't have the order right in front of me, but the order basically -- oh, here we go, October 12th in 2023.

And it simply just clarified, again, what that prior order said.  And again, it didn't give Mr. Gavva any rights. It just simply clarified what the agent's duties were, although it purported to expand the duties of the agent -- of the person that was employed, but didn't say anything about Mr. Gavva's rights, didn't say anything about whether he had the right to pursue actions in the United States to seek enforcement in the United States.

It requires -- and our expert has testified by

19

declaration -- that you have to cite to a specific provision of the bankruptcy laws of Russia, that the orders that have been approved in other bankruptcy cases specifically cite to that order.  It's required.  It's a requirement.

There are some examples that are attached to the declaration of what that order requires.  That wasn't sought and that wasn't obtained.  And so what we're left with is Mr. Gavva is a financial manager that doesn't have standing, doesn't have the right to pursue enforcement in the United States.  He retained an agent who has the right to investigate. And now, by virtue of this clarification order, which is not supposed to give any greater rights than the original order, they're arguing that, well, that essentially gives them the right to pursue actions in the United States.

They rely on agency theory, Your Honor, but they don't say under what law.  Is it U.S. agency theory, or is it Russian agency theory?  It's just a couple of sentences in the supplemental declaration for Mr. Kirpichev.  But they actually have it backwards.  It's the agent that can bind the principal, but the principal can't bind the agent.

The person that was purportedly authorized by the Russian court to pursue a first investigation, and then maybe under the clarification order, which has been appealed, maybe to pursue an action to enforce, to find and then to levy on these assets, wasn't Mr. Gavva; it was the agent.

20

And so again, that matter has been appealed.  They cite to the fact that there's no stay pending appeal.  But there's no authority, there's no evidence that says that you need a stay pending appeal, that it's an effective order until it's final either way.  Except for our expert does say that, while an appeal is pending, the order can't be enforced.

So you don't have a final decision from the Russian court on this issue.  You don't even have a principal decision from the Russian court on this issue.  And it would be unfair and actually improper to ask the bankruptcy court here to determine issues of Russian law.  It's a threshold issue. Standing is jurisdictional.

And so if Mr. Gavva does not have standing, what are we here for?  He doesn't have the right to proceed with this Chapter 15 petition.  And Mr. Gavva is not the petitioner in this case -- Mr. Gavva is, but the agent is not.  And the agent, at best, is the one that has authority.

So Your Honor, there are disputed issues here.  There are legal issues.  They are contradicted by experts.  Our expert says one thing.  Their expert says another thing.  It's not an issue that can be easily resolved, certainly not today. And frankly, it should be resolved by the Russian court, not by the bankruptcy court here.  So that's the standing issue.

With respect to some of the other arguments, I'm going to turn it over to Mr. Zorkin, who's going to talk about the

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document    Page 21 of 62
**Aleksandr Vitalievich Sabadash**

21

foreign main and foreign nonmain proceeding and the judicial estoppel argument, because that's a very important issue.  And I think Your Honor may have had a misunderstanding about what happened in state court.

And I'd like Mr. Zorkin to kind of clarify what happened in state court and why the arguments that were made in state court, that Mr. Sabadash resided and was domiciled in California, why that's binding.  The state court adopted that. And again, I'm going to turn over to Mr. Zorkin to address those issues.

THE COURT:  Thank you.

MR. ZORKIN:  Thank you, Your Honor.  Good afternoon. So in the event that the Court changes its standard of ruling on the public policy exception, then we do need to get to the foreign main or foreign nonmain proceeding issues.  And if I understood Your Honor's tentative correctly, I think there's a factual discrepancy as to the domicile issue, which is the presumption of the center of main interest is the debtor's domicile, that I think it's important to address.

So in state court this year, Mr. Gavva asserted and prevailed on the position that Mr. Sabadash is domiciled in California, not at some earlier time, because that would not accomplish anything on a motion to quash jurisdiction, but this year.  The court's order was issued on March 1st, 2023, finding that Aleksandr Sabadash is domiciled in California and

22

therefore the state court, in the case of Gavva v. Sabadash, not in a divorce case or some earlier proceeding, but in the case of Gavva v. Sabadash, the state court has general jurisdiction over Mr. Sabadash.

THE COURT:  So let me ask a follow-up on that.  I thought -- and thank you for clarifying that.  I may have confused the divorce proceeding versus other proceedings.  But I thought the issue was still about whether service was proper, service on Mr. Sabadash.  And if at an earlier point he was residing here, then --

MR. ZORKIN:  No.

THE COURT:  No?  Okay.  So proceed.

MR. ZORKIN:  So Mr. Sabadash brought a very standard motion to quash service on the grounds of both improper service and, second, lack of personal jurisdiction.  So it's a motion that must be brought in state court together.  If you don't do it, then you waive the right to argue jurisdiction forever.

So the argument for service was that Mr. Sabadash is physically in Russia, and Mr. Gavva could not substitute -- serve him by substitute service at his wife's residence in California.  The argument for jurisdiction was that Mr. Sabadash's domicile is in Russia.  Mr. Gavva opposed both.  And Mr. Gavva prevailed on the issue that Mr. Sabadash is domiciled in California.

And if his domicile is in California, they're under

23

California law, the court has general jurisdiction over Mr. Sabadash, and the motion to quash on jurisdiction grounds was denied on that ground; the court found jurisdiction.  And if there's general jurisdiction over a person, he's domiciled in California, then it follows that that person could be substitute served by just dropping the summons and mailing it to the residence.

So the service was a secondary issue.  There were two issues addressed on the motion to quash.  And so the Court found, based on Mr. Gavva's argument, that Mr. Sabadash is domiciled in California, in 2023, in this case, Gavva v. Sabadash.

Judicial estoppel bars Mr. Gavva forever from arguing that Mr. Sabadash's domicile is anywhere else but California.  This is quintessential judicial estoppel.  The party takes one position in one litigation:  Mr. Sabadash is domiciled in California.  And it takes the opposite position in subsequent litigation:  Mr. Sabadash is domiciled in Russia.

That is exactly what judicial estoppel protects the courts from -- number one, the courts, because Mr. Sabadash can't be domiciled in two places at once.  So either Judge Keosian was misled or this Court is going to be misled.

THE COURT:  Well, help me out on the timing, because obviously, I can be domiciled in one place on day one, and then on day two I can move someplace else, and that doesn't change

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document      Page 24 of 62
**Aleksandr Vitalievich Sabadash**

24

the fact that I was domiciled in the one place on day one.

MR. ZORKIN:  Correct.

THE COURT:  And presumably, the court would -- if I'm domiciled here in California, a California court would have jurisdiction over me, all other things being equal, and me moving to Russia, or France, or anything else wouldn't -- I couldn't escape jurisdiction by doing that.

So help me out on the timing.  You mentioned the decision of the state court was March 1, 2023.  But when did that relate back to, in terms of when the jurisdiction was being first asserted?

MR. ZORKIN:  The complaint, Gavva v. Sabadash, was filed in July or August of 2022.  But the timing doesn't matter because nothing changed.  Mr. Sabadash didn't move to Russia between July of 2022 and today.  Mr. Sabadash has been in jail since 2014.  And Mr. Sabadash's position, which the court disagreed with, was that he lived in Russia, and was arrested in Russia, and intends to remain in Russia.

Mr. Sabadash lost.  And that's the end of the story. That's why we have judicial estoppel.  Mr. Gavva prevailed on this.  Mr. Gavva, his position -- in estoppel, what the courts look at is the party's position taken, not the evidence used to prove the position.  Once you've prevailed on a position, you can't say, well, I found other evidence, I found more evidence now, I found different evidence.

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document      Page 25 of 62
**Aleksandr Vitalievich Sabadash**

25

You've prevailed on the position.  Mr. Sabadash is domiciled in California.  You're stuck with that position. Maybe -- and there's no authority cited for this, and I don't actually think that's how it works.  Maybe if, between then and now, Mr. Sabadash had moved, there could have been some argument.

But nothing's changed.  We're in the exact same factual circumstances as we were in state court.  It's just that it was convenient in state court for Mr. Sabadash to be living -- to be domiciled in California, because otherwise the case would have been thrown out on lack of personal jurisdiction.  And now it's convenient for Mr. Gavva -- for Mr. Sabadash to reside in Russia, because otherwise there is no foreign main proceeding.

THE COURT:  Well, you mentioned that, as part of the California determination, there is the issue of the intent. Mr. Sabadash, although he's in Russia, has intended to come back here and live here.  Is that intent also -- is it the same test for purposes of Chapter 15?

MR. ZORKIN:  So center of main interest for individuals, the courts look at the habitual residence, and the courts that we cite in our papers, they've all equated that with the concept of domicile, which is the same under state court.  It's your presence, physical presence, with intent to remain.

26

So I haven't seen anything in the bankruptcy context that -- in the COMI context, that distinguishes that concept from the state court, from California law, which is physical presence with intent to remain.

It is true that Mr. Sabadash has argued that his physical presence with intent to remain has been in Russia. But he lost on that argument. The state court adopted Mr. Gavva's position. Mr. Sabadash then moved for reconsideration. The state court denied that motion.

Mr. Sabadash then filed a petition for writ of mandate in the Court of Appeal, which Mr. Gavva opposed, arguing that his declaration saying that he lives in Russia is not credible, and the court correctly found it was not credible and correctly found that Mr. Sabadash is domiciled in California. That's the end of the story on domicile.

I think Judge Easterbrook put it perfectly, in the Seventh Circuit. The principle is that, if you prevail in suit one by representing that A is true, you are stuck with A in all later litigation arising out of the same events. Why should one be entitled to win the first suit by demonstrating A and the second suit by demonstrating not A? That's exactly what's happening here.

Mr. Gavva made a -- Mr. Gavva knows where Mr. Sabadash lives. He's the financial manager. He's a charge of his estate. He made a deliberate strategic move in litigation to

27

assert that Mr. Sabadash lives in California because, I assume, his lawyers explained to him that the case is going to be thrown out on jurisdictional grounds.  And several months later, when the court in California found the no standing, on California law grounds, by the way, not on Russian law grounds, Mr. Gavva completely changes -- this is honestly the most egregious case of estoppel that I've seen.  It's a diametrically opposed position.

And there is a case, actually, that I would like to point the Court to, Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC, 692 F.3d 983.  It's a Ninth Circuit decision from 2012.  And in that case, the estate of Marilyn Monroe took the position that she died domiciled in California -- I'm sorry -- in New York.  And that was because New York had favorable tax laws.  And at some later point, the estate realized that California had more favorable inheritance laws.  And in another litigation, the estate argued that she died domiciled in California.

And the argument was very similar to Mr. Gavva's that, well, there's evidence we had -- look at this evidence that shows that she was domiciled in California when she died.  And the Ninth Circuit says, tough, you've argued and won on this position, this assertion that Marilyn Monroe died in New York.  You can't switch that now.  It doesn't matter what the evidence says.  It's not based on evidence.  It's based on what you've

28

asserted.  And they've asserted Mr. Sabadash is domiciled in California.  They've asserted it this year, not in 2008 or some other thing.  And there's no exception to judicial estoppel that would apply here.

THE COURT:  I understand your argument.  I'm going to need to hear from the other side and look more closely at the papers.  But I understand.  What else?

MR. ZORKIN:  So that's the domicile aspect.  So the way things stand here, Mr. Sabadash's position is that the presumption of Section 1516(c) is that Aleksandr's domicile is in California, and Mr. Gavva is not permitted to contradict that.

Now, Mr. Gavva can also establish foreign main proceeding if he can show three other factors weigh in his favor.  And these are:  whether there are assets in Russia, whether there are creditors in Russia, and what law would apply to the dispute between the parties.

And I understand that the Court found that it doesn't need to reach these factors because it's denying the motion. And that's fine with Mr. Sabadash, but I would still like to address it in the event the Court changes its tentative ruling.

So the assets in Russia -- and I'm glad in the beginning the Court mentioned the record, because that's really where everything starts and ends.  The burden of proof is on Mr. Gavva to establish that Mr. Sabadash has assets in Russia.

29

Now, the evidence before the Court, the record here is conclusive that there are no assets in Russia.  We have Mr. Gavva's own report.

THE COURT:  Well, there's -- for bankruptcy purposes, I think the argument on the other side was a claim is an asset. And there are claims to indirect ownership of the factory in Russia.  And so that is -- for purposes of the location analysis, that should be considered an asset in Russia.  So I'm not taking a position on that at this point.  I just want to be clear that that's my understanding.  So why don't you address that?

MR. ZORKIN:  Right.  So Mr. Sabadash has no claims in Russia.  There's nothing in the evidence that Mr. Sabadash is having any claims to any assets in Russia.  The claim is by Vyborg Limited, which is not a debtor, which is not a part of this estate.  Mr. Sabadash does not own Vyborg Limited.  And he didn't own the -- it's even more removed.  There's a Russian corporation, VLK, that owns the factory.

Mr. Sabadash has no claims in litigation in Russia. He's not part of that case.  And the only authority cited in support of this involved a case where the debtor, in bankruptcy, was a plaintiff in another case.  And so that Court, In re: McClure (phonetic), had no trouble making an uncontroversial statement that the debtor has assets, which are the debtor's own claims in litigation, where the debtor is the

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document    Page 30 of 62
**Aleksandr Vitalievich Sabadash**

30

plaintiff.  We don't have that here.

THE COURT:  Well, so I'm used to analyzing things, of course, from a bankruptcy perspective.  And there are contexts, such as substantive consolidation, or alter ego, or things like that, where bankruptcy courts are used to collapsing the indirect ownership to say, well, who's really the owner here?  And now, there are other instances where we are careful to make very hard lines between what's a debtor and what's not a debtor.

And so for example, with substantive consolidation, again, the test is pretty tough.  You have to show such a -- if I remember right, such a mix up of books and records that you can't tell who is creditor of which entity and/or that there's really so much control that it's one and the same.  So --

MR. ZORKIN:  There is nothing --

THE COURT:  So what I'm wondering is, yes, Mr. Sabadash has only an indirect ownership, but I thought, from the record that's presented, that -- isn't the chain of ownership that Mr. Sabadash has 100 percent ownership of X, which has 100 percent ownership of Y, which has 100 percent ownership of Z?

And so for purposes of center of main interest, and determining where is, sort of, the gravity of this case, what's the center of gravity of this case, don't I have to perceive that it's in Russia, at least insofar as the this factory is

31

concerned?

MR. ZORKIN:  No, because, as Your Honor said, you have to go by what's in the record.  And there's no argument as to alter ego.  There's definitely no evidence that any of these entities are alter egos of Mr. Sabadash, the debtor.

THE COURT:  The alter ego thing -- I'm sorry if I misled you -- that's just an analogy.  I'm just saying that, for purposes of the way I am used to looking at things, sometimes it's appropriate, in a bankruptcy context, to collapse different entities into one so as to get to what we think Congress intended.

And I think, under the case law, and under just the plain reading of the statute, when you talk about a center of main interest, to me, that's kind of a center of gravity.  And for those purposes, if you have Mr. Sabadash owning 100 percent of something, that owns 100 percent of something, that owns 100 percent of a factory, it's kind of -- when administering Mr. Sabadash's financial affairs, it seems as if, for those purposes, the center of his commercial ownership is Russia.

MR. ZORKIN:  But that is not how the courts have put it.  The courts specifically ask where are the debtor's assets located.  And it's undisputed that the debtor does not have assets in Russia.  A factory that -- let's go backwards.  The debtor is a shareholder of a California corporation, that owns Vyborg Limited, that used to -- before the creditor stole it --

32

that used to own a factory.

And so there's nothing that I've seen in the bankruptcy cases that say, for purposes of this factor, which is where are the assets, that we have to -- we don't actually look at where are the assets; we're going to look at, in case this corporation wins a lawsuit, then the debtor will indirectly own something, maybe, contingently, sometime down the line. We don't look at that.

In re Ran and In re Pirogova are the two cases we rely on. They talk about assets. What does the debtor own at the time of the petition for recognition is filed? We don't look at previous activity. We don't not -- not that we don't look at it, but the court cannot look at the debtor fighting off claims or being involved in litigation. That is not part of this factor, where the assets are located. The factor is where the debtor has assets.

The only assets the debtor has is AFB Trading One, a California corporation. There are no assets in Russia. None are in the record. Mr. Gavva -- the financial manager, Mr. Gavva, in charge of Mr. Sabadash's affairs, on the same day that this petition was filed, submitted a report to the Russian bankruptcy court. The factory is nowhere to be found there.

How can Mr. Gavva come to this Court and say, well, don't worry about what I said to the Russian court. Forget that I didn't list any Russian assets there. Let's just

33

pretend that, sometime in the future, Vyborg Limited wins the lawsuit, and then Mr. Sabadash will have assets.  That's not the factor.  The factor is where are the debtor's assets.

THE COURT:  Okay.  I understand.  So you were going to cover the assets in Russia, creditors in Russia, and what law would apply.

MR. ZORKIN:  Right.  I think the creditors in Russia, Your Honor, you kind of called it.  There are two creditors there.  There's one creditor here.  Mr. Itkin's claim is five times larger.  If Mr. Itkin were to prevail, it would swallow up the other claims.  At best, this factor is neutral.

And even if the Court would go literal and say, well, there's two there and there's one here, that factor alone would not weigh in favor of establishing a center of main interest in Russia, when you consider the entire record, and when you look at the rest of the evidence.

On what law applies to the dispute, the only dispute between Mr. Gavva and Mr. Sabadash is whether these foreign judgments should be recognized.  That's a pure issue of California law.  See CCP 1713, the Foreign Country Money Recognition Act.

In Mr. Gavva's complaint, no other claims are asserted.  There were voidable transaction claims, which the Court threw out on a previous demurrer.  So the only thing that's left is a straight California law case.  There is

34

nothing from the Russian bankruptcy court that's been handed down for this Court to administer as something to do with Russian law.

In the reply, Mr. Gavva cites the fact that Vyborg Limited has a lawsuit in Russia.  That's not a dispute between Mr. Gavva and Mr. Sabadash.  That's not really a dispute involving Mr. Sabadash at all.  So there's no issues of Russian law to decide here.

I guess I should address what I think is a misstatement of why we're here.  It is true that the state court sustained a demurrer for lack of standing to prosecute the Foreign Country Money Recognition Act claim, because Mr. Gavva, under California law, is not a creditor of Mr. Sabadash.

Mr. Sabadash proceeded entirely under California law. But anticipating Mr. Gavva's argument that Russian law grants him standing, Mr. Sabadash also addressed in the demurrer that Russian law doesn't apply.  And Mr. Sabadash, actually, in the demurrer, made a choice-of-law argument that, if the Court wanted to apply Russian law, under California's choice-of-law principles, California law still would apply.

And so it's incorrect that the Russian court made a determination -- oh, I'm sorry -- that the state court made a determination that Mr. Gavva had to obtain recognition before he could proceed with that case.  The state court dismissed the case on state law grounds, and told Mr. Gavva that, your

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document    Page 35 of 62
**Aleksandr Vitalievich Sabadash**

35

bankruptcy arguments, I don't understand why you're making them; we're not in bankruptcy court.  That was the extent of the Russian law's application to the state court case.  It's a pure California law case.  So there is no Russian court that would -- no Russian law that would apply here.

That's really it for the foreign main proceeding, I could discuss the foreign nonmain proceeding.  I think it's an establishment as defined.  Many cases define it.  And Mr. Gavva does not address the definition.  I don't want to monopolize the time.  I think I should address the foreign nonmain proceeding argument, but I also want the Court to --

THE COURT:  Why don't you do that briefly, because we are --

MR. ZORKIN:  Sure.

THE COURT:  -- taking a long time here.

MR. ZORKIN:  Sure.  So real briefly, to establish -- again, it's Mr. Gavva's burden of proof, based on the record in front of the Court, to show an establishment.  For a nonmain proceedings, Mr. Gavva must show that Mr. Sabadash has a place of operations in Russia, from where he carries out nontransitory economic activity at the time that the petition for recognition is brought in the United States.

So he has to show that, on August 29th, 2023, Mr. Sabadash was carrying out -- was exercising economic activities on the local market in Russia.  That's how the courts decide

36

it.  And this is more than incorporation, record keeping, ownership of assets, maintenance of assets.  None of those arguments satisfy the burden to show an establishment.

And here, their only evidence is that -- well, let's put it this way.  There is no evidence of an establishment. Mr. Gavva puts forward 2016 corporate documents that Mr. Sabadash signed from jail.  One of them is a shareholder resolution of a California corporation, nothing to do with economic activity in Russia.  Another one is a power of attorney issued to a Swiss lawyer to act on Mr. Sabadash's behalf outside of Russia.  So none of that is economic activity in Russia.

And cases are also -- each case that we looked at, especially Pirogova, says that the actual activity in foreign bankruptcy itself cannot be an establishment, because otherwise there would be no point to have this prong to prove an establishment.

So I'll end with where we started.  We have to look at the record.  There is nothing in the record that shows Aleksandr has any assets in Russia.  In fact, there's evidence that he does not.  And there's nothing in the record that shows he has economic activity in Russia.  And in fact, there's evidence that he does not have economic activity.  That has not been disputed in any way in their reply.

THE COURT:  Thank you.

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document      Page 37 of 62
**Aleksandr Vitalievich Sabadash**

37

MR. STOLYAR:  If I may, Your Honor?

THE COURT:  Yes, please.

MR. STOLYAR:  I'll address the judicial estoppel argument, and then I'll turn over the rest to my colleague.

So on judicial estoppel, I think what you heard just now from opposing counsel is not correct factually, because what was argued in the state court action, where I was arguing opposing Mr. Zorkin, was where service -- the issue was, was service effective.

And the legal test for whether substitute service was proper, and whether he was domiciled in California, and therefore the Court had jurisdiction, personal jurisdiction over him, was as of the date of the time of service of the state complaint, which was July 2022, Your Honor.

And we cite case law in our reply papers that says, for example, In re Marriage of Thompson 74 Cal.App.5th 481, 487, a 2022 case.  It says the relevant Constitutional inquiry for jurisdictional purposes is -- and I quote -- "where the defendant is domiciled in the forum state when the lawsuit is commenced".

So that was the point in time that was litigated in the state court action.  That was July 2022, more than a year prior than the date of the Chapter 15 petition, which is August of this year, Your Honor.

So the test for judicial estoppel is clearly

38

inconsistent positions.  It is not clearly inconsistent to argue that defendant is domiciled at one point, in July 2022, and then a different point, in August 2023.  Those are not clearly inconsistent positions, as a matter of law.  And so I think Your Honor was entirely correct when it found that their judicial estoppel argument does not fly.

THE COURT:  So Mr. Zorkin was just arguing that there has been no factual change, that Mr. Sabadash has been incarcerated since, I think, he said 2014.  And so, at least I'm aware that, in some countries, sometimes incarceration is loose and you can actually be traveling quite a bit.  But at least in my mind, it suggests that he's in Russia, been in Russia, and not moving around.

So how is it that it's relevant that there is a year between July 22nd and August 23rd, when the fact of his actual physical location has not changed and his likelihood of ever returning to California, if he has a slim chance, or a somewhat more than slim chance, either way, isn't it the same -- or do I not have any evidence in the record that would show me that it's different between those two times?

MR. STOLYAR:  Well, let me respond to Your Honor. Here's the difference.  When we filed the complaint, and when this was litigated, we relied on sworn statements from Mr. Sabadash made prior to the filing of the state court action, where he himself, in a sworn declaration, said, hey, I live in

Case 2:23-bk-15574-NB   Doc 119   Filed 07/01/24   Entered 07/01/24 06:43:01   Desc
Main Document     Page 39 of 62
**Aleksandr Vitalievich Sabadash**

39

California, I intend to remain in California; my family is here.

So we relied on that.  And the state court correctly found that, based on Mr. Sabadash's own statements, as of the date of the filing of the state court action, the court would conclude he was domiciled in California.  After the filing of the state court action, when it was convenient for Mr. Sabadash, he submitted very different declarations, including when he was challenging the state court's action.  And when he was challenging the state court's March 1 order, he submitted a declaration on March 13 of this year saying, hey, not only am I imprisoned in Russia, I intend to remain indefinitely in Russia.

And Your Honor correctly pointed out, half of the test is the intent to remain.  And here you have a sworn statement from Mr. Sabadash, submitted after the date of the trial court order, and more than a year -- or sorry, close to a year after the date of service of the state court action, which is new evidence.

It is new evidence of Mr. Sabadash's own words.  He's saying I intend to remain in Russia indefinitely.  And so we are entitled to rely on that a year later, when we come to Your Honor and say, look, Mr. Sabadash, himself, says now he intends to remain in Russia indefinitely.  And so therefore, for purposes of the COMI analysis, right, the presumption of

40

habitual residence, we're entitled to rely on that.

THE COURT:  Okay.  I understand.  Thank you.

MR. ZORKIN:  Your Honor, I have to address something, if I may.  I just -- this is very disappointing.  There's not a single declaration where Mr. Sabadash says I live in California.  Mr. Stolyar is referring to a declaration that he swore, under penalty of perjury, came from PACER, which it did not.  It has a fake signature of Mr. Sabadash on it.  I still don't know where it came from.  I'll leave it at that.

THE COURT:  Okay.

MR. ZORKIN:  The declarations that Mr. Stolyar relies on now, today, here, those are the same declarations Mr. Stolyar called self-serving, perjurious, clearly false.  This was all at issue in the state court case.  And they won.  It's over.  There's not a single case that --

THE COURT:  Okay.  I think --

MR. ZORKIN:  There's no authority otherwise.

THE COURT:  I think we're starting to --

MR. ZORKIN:  You're right.

THE COURT:  -- repeat.

MR. ZORKIN:  Thank you, Your Honor.

THE COURT:  So thank you.

MR. ZORKIN:  I submit on that.

MR. STOLYAR:  Just one very quick point before I turn it over, Your Honor.

41

THE COURT:  Go ahead.

MR. STOLYAR:  What we said was perjurious is very different, as Mr. Zorkin well knows.  What we said was perjurious is when Mr. Sabadash submitted a sworn statement in state court saying he resided in Russia his entire life.  And that was perjury, plain and simple, and the state court agreed.  That was our point.  We didn't argue it was perjurious that he was imprisoned in Russia since 2014.  We said it was perjurious that he said under oath he lived in Russia his entire life and never lived in California ever before in the past.  That was perjury.  And the trial court agreed.

So I'll turn it over to my colleague.

THE COURT:  Thank you.

MR. CARROLL:  Your Honor, with respect to standing, I think it's important to focus on the requirements of the statute.  I can go through -- and we do in our papers, so I'll just do it very quickly.  I can go through how the Russian court actually authorized Mr. Gavva to act in this proceeding.  But that's not what's required by the statute.

Section 1515 only requires that there be a foreign proceeding and that the movant seeking recognition be the foreign representative.  There's no requirement, under U.S. law, under the bankruptcy law, that Mr. Gavva be authorized in the Russian proceeding to commence this action.

So regardless of whether or not he was, in fact --

42

which he was -- authorized by the orders of the Russian court, it's not required.  The statute does not require it.

As I said, I'll do this very briefly, Your Honor.  Mr. Gavva was authorized.  The opposition essentially would argue that Mr. Gavva's agent was authorized, but he was not.  An agent can only have the authority of a principal.

And their second argument is that the Court authorized the employment of Mr. Dupak, the agent, to do things that Mr. Gavva was not authorized to do.  Why would a court authorize one party to do something its party is not entitled to do?  That doesn't make any logical sense, Your Honor.

With respect to the evidence in the record, we have, in the opposition brief, Your Honor, very specific admissions that Mr. Sabadash owned the factory in Vyborg, that he owned the shares, both indirectly, and that he is bringing claims in Russia to recover that.  No more evidence is needed than their own statements.

With respect to -- and that, Your Honor, goes to the first factor of the foreign main COMI analysis.  The second factor, as to the creditors, it's important to note that Mr. Itkin's claim is disputed.  Mr. Itkin's claim, the litigation of which is stayed, so maybe at some point in the future he may be a creditor that has a claim, maybe not.

With respect to establishment, Your Honor, two different things that were certainly an entirely different

43

analysis from what was addressed in state court.  The question of establishment is doing business, essentially, not a intent to remain or anything else.  As I said, the opposition papers make clear that Mr. Sabadash is doing business in Russia and has done business in Russia.

Your Honor, with that, I think we have taken up a lot of your time.  I thank you for that.  And I just conclude with, we believe the appropriate relief, Your Honor, based on your concerns, in particular, is to grant recognition, but condition it.

One of the things Mr. Sabadash asked is to condition it on any assets that are recovered here in the U.S. to stay here in the U.S., subject to a further order of this Court.  That would protect the public policy.  That would protect your concerns that you addressed at the outset, Your Honor.  Thank you.

THE COURT:  Thank you.

MR. OWENS:  Your Honor, I know you've been here for a while, and I don't want to belabor the point, but again, we have an expert, Mr. Asoskov, that has submitted a declaration stating that this is a requirement.  There needs to be authority from a court in Russia to approve the enforcement of a judgment in bankruptcy court overseas, anywhere overseas, including in the United States.  That didn't happen here.

And so this is really not an issue for the bankruptcy

44

court here to decide.  It's really an issue -- and they tried. They tried to get a clarification of the order, and that order didn't go far enough.  The order, again, mentioned their agent, and what the prior order provided, and it simply quoted from an agreement that had been entered into between the principal and the agent.

They're trying to rely on agency law.  But again, the agency law of what jurisdiction?  Russia?  California?  Federal bankruptcy law?  And so there are issues that really are not appropriate for this Court to decide.

We agree with Your Honor's tentative with respect to the public policy issue.  It's a very interesting issue.  There has been commentary cited in our papers in terms of other commentators questioning whether bankruptcy courts should and would and need to essentially abstain from a case involving a Russian entity or an individual, because, frankly, we're in a new world with the war in Ukraine and these series of sanctions and counter-sanctions.

So with that, I want to address the last issue, and that is, if the Court were to grant recognition, the Court could protect Mr. Sabadash and others by limiting what powers the Court gives to Mr. Gavva.  Even if we got there, they're asking for too much, because really what they want to do is try to take control of litigation that, ultimately, is not litigation that Mr. Sabadash has commenced.  It's not

45

litigation that even the first California entity has commenced. It is litigation that's tangential. It's a second entity that has commenced litigation over the transfer of shares in the holding company that owns this Russian pellet factory. Those shares -- it's been conceded, it's in the papers, it's in the exhibits that Tavrichesky Bank owns ninety percent.

Now, that's a claim, but that's not an asset in the sense of money that's going to be coming into this bankruptcy estate. This is not a traditional Chapter 15 case where they're trying to collect assets that are here in California. What they really want to do is take control of this lawsuit by -- they didn't say it, but whether it's piercing the corporate veil or attempting to levy on some sort of equitable ownership interest and ultimately get to the end game, is to wrest control of that litigation and dismiss the litigation.

Yes, this is speculation; there is no evidence in the record. But they haven't submitted evidence that there are assets, in fact, in Russia, that would be appropriate to recognize as a foreign main proceeding. And they haven't met the burden for any of this, certainly the burden for showing that it's a foreign main proceeding or a foreign nonmain proceeding. So with that, Your Honor, I'll sit down.

THE COURT: On that last point --

MR. OWENS: Yeah.

THE COURT: -- I want to tease out two different

46

interpretations.  Are you saying that, if there is something as amorphous as a cause and action, that is not a tangible thing, that it's not appropriate to assign a locus to that?  Or are you saying that, on the facts of this particular cause of action that has to do with ownership of alleged wrongful transfer of shares, that relate to ownership of an entity, that relates to ownership of a factory in Russia, that that's too remote a connection, or both?

MR. OWENS:  Your Honor, I think it's more the latter, though, I suppose, because there could be a situation or a scenario where a claim has real value, that a claim can be pursued.  For example, I don't know, fraudulent transfer claim and there's been assets transferred and there's a collection, and maybe, in that scenario, that might be an asset that might satisfy that test.

But I mean, you have a incarcerated person in Moscow, in a jail in Moscow, since 2014, who has no business that he's running.  He's in jail.  And so they cite to these articles of -- cite to decisions that may have been made in 2000 -- I think it was '09, or what was the date -- the articles of incorporation or the --

MR. ZORKIN:  2016.

MR. OWENS:  2016, they cite to that.  They cite to the power of attorney to a Swiss attorney.  But again, that doesn't -- we have not come across any case law that says that

47

that will satisfy the test for determining an establishment when you have an individual that's incarcerated.  And somehow, if the only asset is really potentially if you were to pierce the veil, alter ego, substance consolidation, and all that, the only asset really is a litigation claim.  And that litigation claim, at least one of the banks really has an incentive to defeat that litigation, because they claim to own ninety percent of the entity now that controls the pellet factory in Russia.  So Your Honor, on these facts, we don't believe that they've met their burden.

THE COURT:  Okay.  I understand.  Thank you.

MR. OWENS:  Thank you.

MR. CARROLL:  Just very briefly, Your Honor.

THE COURT:  Go ahead.

MR. CARROLL:  And thank you for your indulgence.  With respect, Your Honor, to the litigation with respect to the shares, counsel is essentially alleging that we, in this proceeding, are attempting to affect that proceeding.  We are only seeking recognition here in the U.S. which, if granted, would only allow us to take actions here.  It would not allow us to take actions in a Russian court.  So that certainly doesn't apply.

With respect to establishment, Your Honor, it is in fact the own admissions, in Mr. Sabadash's papers, which make clear the business that he is running and has been running

48

since he was imprisoned in Russia.

THE COURT:  Okay.  Let's talk about a continued hearing date, and then I will take this under submission.  I think it's appropriate to bar the filing of any additional papers at this point.  I sometimes do that as a matter of course, because I do have parties who will constantly keep filing papers.  And I don't think that's your style for any of you, but let's just make that clear.

So the tentative ruling was to continue the status conference to December 5 at 2 p.m., which is concurrent continued hearings on some motions for relief from the automatic stay.  It seems to me that it probably makes sense to continue this hearing to the same date and time.  And as I say, I may issue a written ruling soon, or you might get an oral ruling at that continued hearing.

Anything else we should be addressing today, other than continuing, if I didn't mention it, the Golden Sphinx status conference, to the same date and time?  So continue everything for today, basically, to December 5 at 2 p.m.

MR. OWENS:  Your Honor, the --

MR. HOWARD:  Your Honor --

MR. OWENS:  Sorry.  Go ahead, Mr. Howard.

MR. HOWARD:  Your Honor, I just wanted -- Ronald Howard, Togut, Segal & Segal, on behalf of Alexander Adam and Andy Wood, foreign representatives to Golden Sphinx Limited.

49

Your Honor, I just wanted to make a very brief statement.  We understand, in some of the papers filed by Mr. Gavva, there have been assertions made that Mr. Sabadash owns property located in Beverly Hills.  And I just wanted to represent, on behalf of our clients, that we dispute such an assertion.

In papers that we filed in the Golden Sphinx case, we've made it clear that that property is owned by New Albion Property Limited, which is a wholly-owned subsidiary of that Chapter 15 debtor.  And I just wanted to get that on the record, Your Honor.

THE COURT:  Thank you.  And I may have misspoken on that too.  It is an indirect ownership interest.  It is not a direct ownership.

MR. ZORKIN:  Your Honor, I think, on behalf of Mr. Sabadash, he does not claim any interest in the Beverly Hills property, direct or indirect.  Mr. Sabadash agrees that Golden Sphinx Limited, with the foreign representatives, are the proper authority over that property.

THE COURT:  Okay.  Thank you.

So any objection to the date that I have mentioned, December 5 at 2 p.m.?

MR. CARROLL:  No, Your Honor.

THE COURT:  Okay.

MR. HOWARD:  No, Your Honor.

50

THE COURT:  Then I think that concludes today's hearing.  Thank you all for your very careful papers and your arguments.  And the matter is submitted.

MR. OWENS:  Thank you, Your Honor.

MR. HOWARD:  Thank you.

THE COURT:  You're welcome.

(Whereupon these proceedings were concluded at 4:10 PM)

51

C E R T I F I C A T I O N

I, Sharona Shapiro, certify that the foregoing transcript is a true and accurate record of the proceedings.

_Sharona Shapiro_

_____

/s/ SHARONA SHAPIRO, CET-492


eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020


Date:  June 30, 2024

## A

**ability (1)**
15:25
**able (1)**
9:21
**absent (1)**
13:6
**abstain (1)**
44:15
**access (1)**
16:20
**accomplish (1)**
21:23
**accurate (2)**
5:14;9:10
**across (1)**
46:25
**Act (4)**
33:21;34:12;36:10;
41:18
**action (15)**
13:6,11;15:15;18:5;
19:24;37:7,22;38:24;
39:5,7,9,18;41:24;
46:2,5
**actions (5)**
16:8;18:23;19:14;
47:20,21
**activities (2)**
16:21;35:24
**activity (8)**
7:16;32:12;35:21;
36:9,11,14,22,23
**actual (2)**
36:14;38:15
**actually (10)**
9:10;13:21;19:18;
20:10;25:4;27:9;32:4;
34:17;38:11;41:18
**Adam (2)**
3:22;48:24
**additional (1)**
48:4
**address (14)**
13:16;14:19,23;
16:23;21:9,19;28:21;
29:10;34:9;35:9,10;
37:3;40:3;44:19
**addressed (7)**
11:10,21;17:8;23:9;
34:16;43:1,15
**addressing (2)**
11:11;48:16
**administer (1)**
34:2
**administering (1)**
31:17
**admissions (2)**
42:13;47:24
**admittedly (1)**
5:25

**admonition (1)**
5:10
**adopted (2)**
21:8;26:7
**AFB (1)**
32:17
**affairs (3)**
12:25;31:18;32:20
**affect (2)**
13:22;47:18
**afternoon (4)**
3:10,15,20;21:12
**again (15)**
9:19;11:12;14:20;
16:21;17:21;18:17,
18;20:1;21:9;30:11;
35:17;43:19;44:3,7,
46:24
**against (4)**
8:22;10:13;12:1;
14:24
**agency (5)**
19:15,16,17;44:7,8
**agent (15)**
11:16;17:9,23;
18:20;19:10,19,20,25;
20:16,17;42:5,6,8;
44:3,6
**agent's (1)**
18:19
**agree (4)**
15:1,6;16:17;44:11
**agreed (2)**
41:6,11
**agreement (2)**
18:7;44:5
**agrees (1)**
49:17
**ahead (4)**
16:25;41:1;47:14;
48:22
**Albion (1)**
49:8
**Aleksandr (2)**
21:25;36:20
**Aleksandr's (1)**
28:10
**Alex (1)**
3:11
**Alexander (2)**
3:22;48:24
**allegations (2)**
7:19;8:4
**alleged (1)**
46:5
**alleging (1)**
47:17
**allow (2)**
47:20,20
**allowed (1)**
8:21
**allowing (1)**
11:14

**alone (1)**
33:13
**alter (5)**
30:4;31:4,5,6;47:4
**alternative (1)**
9:16
**alternatively (1)**
9:24
**although (3)**
9:14;18:19;25:17
**always (2)**
4:6;5:8
**amorphous (1)**
46:2
**amount (1)**
17:10
**analogy (1)**
31:7
**analysis (10)**
5:20;8:16;9:5,16,
17;12:10;29:8;39:25;
42:19;43:1
**analyzing (1)**
30:2
**and/or (1)**
30:13
**Andy (2)**
3:21;48:25
**ANGELES (1)**
3:1
**anticipating (1)**
34:15
**anymore (1)**
16:20
**appeal (6)**
8:23;12:6;20:2,4,6;
26:11
**appealed (2)**
19:23;20:1
**appear (3)**
6:17,19;12:4
**appearance (1)**
4:1
**appearances (2)**
3:7,9
**Apple (1)**
10:18
**application (6)**
13:9;17:9,13,23;
18:4;35:3
**applies (1)**
33:17
**apply (14)**
8:19;10:2;11:3,25;
12:25;16:22;28:4,16;
33:6;34:17,19,20;
35:5;47:22
**applying (1)**
9:24
**appointed (1)**
17:5
**appropriate (7)**
5:18;31:9;43:8;

44:10;45:18;46:3;
48:4
**approval (1)**
17:12
**approve (1)**
43:22
**approved (1)**
19:3
**approving (1)**
18:9
**Archives (1)**
27:10
**argue (6)**
8:10;16:21;22:17;
38:2;41:7;42:4
**argued (4)**
26:5;27:17,22;37:7
**arguing (5)**
19:13;23:13;26:11;
37:7;38:7
**argument (19)**
8:7;10:7;12:13;
21:2;22:18,21;23:10;
25:6;26:7;27:19;28:5;
29:5;31:3;34:15,18;
35:11;37:4;38:6;42:7
**arguments (10)**
4:17;8:7;14:17;
16:23;17:1;20:24;
21:6;35:1;36:3;50:3
**arising (1)**
26:19
**around (2)**
5:8;38:13
**arrested (2)**
8:14;24:17
**articles (2)**
46:18,20
**Asoskov (1)**
43:20
**Asoskov's (1)**
17:18
**aspect (1)**
28:8
**assert (1)**
27:1
**asserted (6)**
21:20;24:11;28:1,1,
2;33:23
**asserting (1)**
8:12
**assertion (3)**
5:4;27:23;49:6
**assertions (6)**
5:6;7:15,17;8:22;
9:9;49:3
**asset (9)**
9:8,12,13;29:5,8;
45:7;46:14;47:3,5
**assets (32)**
9:6;13:12,12;17:20,
24;19:25;28:15,22,
25;29:2,14,24;31:21,

23;32:4,5,10,15,16,
17,18,25;33:2,3,5;
36:2,2,20;43:12;
45:10,18;46:13
**assign (1)**
46:3
**assist (2)**
17:9,24
**assume (1)**
27:1
**attached (2)**
17:17;19:5
**attempting (2)**
45:13;47:18
**attempts (1)**
6:8
**attention (1)**
5:9
**attorney (3)**
36:10;46:24,24
**August (5)**
24:13;35:23;37:23;
38:3,15
**authorities (1)**
4:16
**authority (12)**
13:11;14:4;17:4,25;
20:3,17;25:3;29:20;
40:17;42:6;43:22;
49:19
**authorization (1)**
6:16
**authorize (1)**
42:9
**authorized (10)**
17:13,19;19:21;
41:18,23;42:1,4,5,7,9
**automatic (1)**
48:12
**avail (1)**
16:15
**aware (4)**
15:8,9,10;38:10

## B

**back (3)**
15:10;24:10;25:18
**backwards (2)**
19:19;31:23
**bad (2)**
7:15,21
**bad-faith (1)**
7:12
**Bank (1)**
45:6
**bankruptcy (31)**
15:14,14,19,25;
16:6,15;17:3,22,22;
19:2,3;20:10,23;26:1;
29:4,22;30:3,5;31:9;
32:3,22;34:1;35:1,2;
36:15;41:23;43:23,

25;44:9,14;45:8
**banks (12)**
  6:4,5,9;8:21;10:4;
  12:9,18;13:13;16:5,
  14,19;47:6
**bar (1)**
  48:4
**bars (1)**
  23:13
**based (9)**
  6:17;12:22;14:8;
  23:10;27:25,25;
  35:17;39:4;43:8
**basically (3)**
  18:8,15;48:19
**basis (1)**
  13:22
**bear (1)**
  17:14
**beginning (1)**
  28:23
**behalf (6)**
  3:21;10:24;36:11;
  48:24;49:5,15
**belabor (1)**
  43:19
**beneficiaries (1)**
  16:7
**best (2)**
  20:17;33:11
**Beverly (4)**
  8:13;9:7;49:4,16
**bind (2)**
  19:19,20
**binding (2)**
  14:7;21:8
**bit (2)**
  14:20;38:11
**books (1)**
  30:12
**both (4)**
  22:14,22;42:15;
  46:8
**bottom (1)**
  9:19
**bound (1)**
  6:1
**brief (2)**
  42:13;49:1
**briefly (4)**
  35:12,16;42:3;
  47:13
**briefs (1)**
  8:18
**bring (2)**
  6:22;13:6
**bringing (1)**
  42:15
**brings (1)**
  3:4
**brought (3)**
  22:13,16;35:22
**burden (6)**

28:24;35:17;36:3;
  45:20,20;47:10
**business (5)**
  43:2,4,5;46:17;
  47:25
**businesses (1)**
  16:19

**C**

**CalApp5th (1)**
  37:16
**calendars (1)**
  3:4
**CALIFORNIA (50)**
  3:1;13:3,5;16:11;
  21:8,22,25;22:21,24,
  25;23:1,5,11,14,17;
  24:4,4;25:2,10,16;
  26:3,14;27:1,4,5,13,
  16,18,21;28:2,11;
  31:24;32:18;33:20,
  25;34:13,14,20;35:4;
  36:8;37:11;38:17;
  39:1,1,6;40:6;41:10;
  44:8;45:1,10
**California's (1)**
  34:19
**Call (1)**
  3:3
**called (2)**
  33:8;40:13
**came (3)**
  4:13;40:7,9
**can (17)**
  6:11,23;9:20,23;
  14:19;19:19;20:21;
  23:24,25;28:13,14;
  32:23;38:11;41:16,
  17;42:6;46:11
**careful (2)**
  30:7;50:2
**carries (1)**
  35:20
**CARROLL (12)**
  3:10,11,13;4:9;
  10:14,23,24;14:21;
  41:14;47:13,15;49:23
**carry (1)**
  16:1
**carrying (1)**
  35:24
**case (40)**
  4:13,17;6:1;11:9;
  13:16,24;15:5,9;
  17:22;20:16;22:1,2,3;
  23:11;25:11;27:2,7,9,
  12;29:20,21,22;30:23,
  24;31:12;32:5;33:25;
  34:24,25;35:3,4;
  36:13;37:15,17;
  40:14,15;44:15;45:9;
  46:25;49:7

**cases (9)**
  11:21;15:4,10,17;
  19:3;32:3,9;35:8;
  36:13
**cause (3)**
  5:6;46:2,4
**CCP (1)**
  33:20
**cede (1)**
  14:12
**center (12)**
  8:16;9:1,15,23;
  21:18;25:20;30:22,
  24;31:13,14,19;33:14
**centered (1)**
  9:18
**certain (4)**
  9:17;17:10,10,20
**certainly (9)**
  7:15;9:7;11:19;
  14:10;15:16;20:21;
  42:25;45:20;47:21
**cessation (1)**
  6:8
**chain (1)**
  30:18
**challenging (2)**
  39:9,10
**chance (2)**
  38:17,18
**change (3)**
  12:9;23:25;38:8
**changed (3)**
  24:14;25:7;38:16
**changes (3)**
  21:13;27:6;28:21
**Chapter (8)**
  11:7;13:7;17:3;
  20:15;25:19;37:23;
  45:9;49:10
**characterization (1)**
  15:11
**characterizing (1)**
  11:14
**charge (2)**
  26:24;32:20
**check (1)**
  4:6
**choice-of-law (2)**
  34:18,19
**Circuit (3)**
  26:17;27:11,22
**circumstances (1)**
  25:8
**cite (11)**
  7:8;15:21;19:1,3;
  20:2;25:22;37:15;
  46:18,19,23,23
**cited (7)**
  7:9;15:17;17:7;
  18:2;25:3;29:20;
  44:13
**cites (1)**

34:4
**claim (17)**
  4:14;8:21;29:5,14;
  33:9;34:12;42:21,21,
  23;45:7;46:11,11,12;
  47:5,6,7;49:16
**claims (10)**
  29:6,12,14,19,25;
  32:14;33:11,22,23;
  42:15
**clarification (4)**
  18:13;19:11,23;
  44:2
**clarified (2)**
  18:17,19
**clarify (1)**
  21:5
**clarifying (1)**
  22:6
**clear (8)**
  7:13,23,25;29:10;
  43:4;47:25;48:8;49:8
**clearly (4)**
  37:25;38:1,4;40:13
**clerk (1)**
  4:18
**clerks (1)**
  5:11
**clients (1)**
  49:5
**close (1)**
  39:17
**closely (1)**
  28:6
**closer (1)**
  6:22
**collapse (1)**
  31:10
**collapsing (1)**
  30:5
**colleague (3)**
  3:16;37:4;41:12
**collect (2)**
  13:12;45:10
**collecting (1)**
  17:25
**collection (2)**
  16:8;46:13
**comfortable (1)**
  11:14
**COMI (3)**
  26:2;39:25;42:19
**coming (2)**
  13:8;45:8
**comity (1)**
  15:24
**commence (2)**
  17:3;41:24
**commenced (5)**
  13:3;37:20;44:25;
  45:1,3
**commentary (1)**
  44:13

**commentators (1)**
  44:14
**comments (1)**
  10:25
**commerce (1)**
  6:8
**commercial (2)**
  16:20;31:19
**company (1)**
  45:4
**complaint (5)**
  13:10;24:12;33:22;
  37:14;38:22
**complete (2)**
  6:7,7
**completely (1)**
  27:6
**conceded (1)**
  45:5
**concept (2)**
  25:23;26:2
**concerned (1)**
  31:1
**concerns (2)**
  43:9,15
**conclude (2)**
  39:6;43:7
**concluded (1)**
  50:7
**concludes (1)**
  50:1
**conclusive (1)**
  29:2
**concurrent (1)**
  48:10
**condition (2)**
  43:9,11
**conference (4)**
  3:5,6;48:10,18
**confused (1)**
  22:7
**Congress (1)**
  31:11
**connection (1)**
  46:8
**connections (1)**
  8:17
**consider (2)**
  13:14;33:15
**considered (1)**
  29:8
**consolidation (3)**
  30:4,10;47:4
**constantly (1)**
  48:6
**Constitutional (2)**
  15:24;37:17
**construed (1)**
  11:24
**contested (2)**
  5:5,6
**context (4)**
  17:21;26:1,2;31:9

In Re: Aleksandr Vitalievich Sabadash

November 14, 2023

**contexts (1)**
30:3
**contingently (1)**
32:7
**continue (4)**
13:11;48:9,13,18
**continued (5)**
10:8,11;48:2,11,15
**continuing (1)**
48:17
**contractor (1)**
17:19
**contradict (1)**
28:11
**contradicted (1)**
20:19
**control (4)**
30:14;44:24;45:11,
15
**controls (1)**
47:8
**controversial (1)**
5:7
**convenient (3)**
25:9,12;39:7
**convincing (1)**
7:25
**corporate (2)**
36:6;45:13
**corporation (5)**
29:18;31:24;32:6,
18;36:8
**correctly (5)**
21:16;26:13,14;
39:3,14
**couching (1)**
8:2
**counsel (2)**
37:6;47:17
**counter-sanctions (1)**
44:18
**countries (1)**
38:10
**Country (2)**
33:20;34:12
**couple (2)**
6:4;19:17
**course (5)**
5:4;7:19;14:13;
30:3;48:6
**Court (157)**
3:3,4,12,14,18,24;
4:10;6:17,22,25;7:4,5,
7;10:16,19,22;13:4,5,
8,11,20,22;14:3,7,8,
14,22;15:22;16:9,16,
25;17:5,6,8,11;18:9,
10;19:22;20:8,9,10,
22,23;21:4,6,7,8,11,
13,20;22:1,3,5,12,16;
23:1,3,9,22,23;24:3,3,
4,9,16;25:8,9,15,24;
26:3,7,9,11,13;27:4,

10;28:5,18,21,23;
29:1,4,23;30:2,16;
31:6;32:13,22,23,24;
33:4,12,24;34:1,2,11,
18,21,22,24;35:2,3,4,
11,12,15,18;36:25;
37:2,7,12,22;38:7,24;
39:3,5,5,7,16,18;40:2,
10,14,16,18,20,22;
41:1,5,6,11,13,18;
42:1,7,9;43:1,13,17,
22,23;44:1,10,20,20,
22;45:23,25;47:11,14,
21;48:2;49:12,20,24;
50:1,6
**courts (14)**
6:18;11:23;15:19;
16:20;23:20,20;
24:21;25:21,22;30:5;
31:20,21;35:25;44:14
**court's (6)**
6:18;7:6;15:25;
21:24;39:9,10
**cover (1)**
33:5
**credible (2)**
26:13,13
**creditor (6)**
8:20;30:13;31:25;
33:9;34:13;42:23
**creditors (12)**
6:5;7:18;8:19;9:2,
5;12:8;16:6;28:16;
33:5,7,8;42:20
**current (2)**
5:14;12:24
**cut (2)**
6:21;16:4
**cutting (1)**
6:9

**D**

**date (13)**
10:9,11;11:6;37:13,
23;39:5,16,18;46:20;
48:3,13,18;49:21
**dated (1)**
18:14
**day (4)**
23:24,25;24:1;
32:20
**dealing (2)**
11:20;12:13
**debtor (15)**
29:15,21,24,25;
30:8,9;31:5,22,24;
32:6,10,13,16,17;
49:10
**debtor's (4)**
21:18;29:25;31:21;
33:3
**December (4)**

17:7;48:10,19;
49:22
**decide (4)**
34:8;35:25;44:1,10
**decided (2)**
16:14;18:12
**decision (11)**
9:20,23;11:10;
13:10,15;14:8;17:7;
20:7,8;24:9;27:11
**decisions (2)**
15:14;46:19
**declaration (12)**
15:9,17;17:18;19:1,
6,18;26:12;38:25;
39:11;40:5,6;43:20
**declarations (3)**
39:8;40:11,12
**defeat (1)**
47:7
**defendant (2)**
37:19;38:2
**define (1)**
35:8
**defined (1)**
35:8
**definitely (1)**
31:4
**definition (1)**
35:9
**deliberate (1)**
26:25
**demonstrating (2)**
26:20,21
**demurrer (5)**
13:5;33:24;34:11,
16,18
**denied (3)**
13:16;23:3;26:9
**deny (3)**
5:23;12:22;14:8
**denying (1)**
28:19
**Depending (1)**
8:24
**details (1)**
6:11
**determination (4)**
9:3;25:16;34:22,23
**determine (2)**
7:14;20:11
**determined (1)**
16:12
**determining (2)**
30:23;47:1
**diametrically (1)**
27:8
**died (4)**
27:13,17,21,23
**difference (1)**
38:22
**different (13)**
7:20;8:9,17;17:21;

24:25;31:10;38:3,20;
39:8;41:3;42:25,25;
45:25
**digest (1)**
9:21
**direct (3)**
10:25;49:14,17
**direction (1)**
8:25
**directly (1)**
18:3
**disagreed (1)**
24:17
**disappointing (1)**
40:4
**disbursed (1)**
11:15
**disbursement (2)**
11:5,12
**discrepancy (1)**
21:17
**discuss (1)**
35:7
**discussed (2)**
4:18;12:12
**discussion (1)**
11:1
**dismiss (3)**
13:4,24;45:15
**dismissed (1)**
34:24
**disposition (1)**
10:12
**dispute (7)**
5:11;28:17;33:17,
17;34:5,6;49:5
**disputed (3)**
20:18;36:24;42:21
**distinction (2)**
11:8,13
**distinguishes (1)**
26:2
**distribute (1)**
13:12
**distributed (3)**
11:18,20;12:16
**District (1)**
11:11
**divorce (3)**
8:10;22:2,7
**docket (1)**
17:17
**documents (1)**
36:6
**domicile (9)**
21:17,19;22:22,25;
23:14;25:23;26:15;
28:8,10
**domiciled (23)**
21:7,21,25;22:23;
23:4,11,16,18,21,24;
24:1,4;25:2,10;26:14;
27:13,17,21;28:1;

37:11,19;38:2;39:6
**done (4)**
12:5,14;14:5;43:5
**down (5)**
10:20;15:4;32:7;
34:2;45:22
**draconian (1)**
6:8
**draft (1)**
18:7
**dropping (1)**
23:6
**due (3)**
4:12,14;15:11
**Dupak (4)**
17:19;18:4,10;42:8
**duties (3)**
18:4,19,20

**E**

**earlier (3)**
21:22;22:2,9
**easily (1)**
20:21
**Easterbrook (1)**
26:16
**economic (6)**
35:21,24;36:9,11,
22,23
**effective (2)**
20:4;37:9
**ego (4)**
30:4;31:4,6;47:4
**egos (1)**
31:5
**egregious (1)**
27:7
**either (9)**
7:14,15;8:1,25;
10:9;14:2;20:5;23:21;
38:18
**else (7)**
13:13;23:14,25;
24:6;28:7;43:3;48:16
**employ (1)**
17:23
**employed (1)**
18:21
**employment (5)**
17:9,13;18:3,10;
42:8
**end (4)**
24:19;26:15;36:18;
45:14
**ends (1)**
28:24
**enforce (2)**
15:15;19:24
**enforced (1)**
20:6
**enforcement (5)**
15:13;16:9;18:23;

In Re: Aleksandr Vitalievich Sabadash                                                November 14, 2023

19:9;43:22
**enforcing (1)**
  17:25
**engaged (1)**
  7:16
**enough (2)**
  8:1;44:3
**entered (1)**
  44:5
**entire (3)**
  33:15;41:5,9
**entirely (3)**
  34:14;38:5;42:25
**entities (2)**
  31:5,10
**entitled (5)**
  13:6;26:20;39:22;
  40:1;42:10
**entity (6)**
  30:13;44:16;45:1,2;
  46:6;47:8
**equal (1)**
  24:5
**equated (1)**
  25:22
**equation (2)**
  15:18,18
**equitable (1)**
  45:13
**escape (1)**
  24:7
**especially (1)**
  36:14
**essentially (6)**
  16:5;19:13;42:4;
  43:2;44:15;47:17
**establish (3)**
  28:13,25;35:16
**establishing (1)**
  33:14
**establishment (10)**
  35:8,18;36:3,5,15,
  17;42:24;43:2;47:1,
  23
**estate (7)**
  5:12;26:25;27:12,
  15,17;29:16;45:9
**estoppel (14)**
  8:7;12:13;21:2;
  23:13,15,19;24:20,21;
  27:7;28:3;37:3,5,25;
  38:6
**Even (7)**
  7:7;15:14;20:8;
  29:17;33:12;44:22;
  45:1
**event (3)**
  7:25;21:13;28:21
**events (1)**
  26:19
**evidence (28)**
  7:13,13,23;8:1;
  20:3;24:22,24,24,25;

27:20,20,24,25;29:1,
  13;31:4;33:16;36:4,5,
  20,23;38:19;39:19,
  20;42:12,16;45:16,17
**evidentiary (2)**
  8:3;9:22
**exact (2)**
  17:15;25:7
**exactly (2)**
  23:19;26:21
**example (4)**
  5:12;30:10;37:16;
  46:12
**examples (1)**
  19:5
**except (2)**
  5:17;20:5
**exception (15)**
  5:25,25;6:3,11;
  10:2;11:2,22,24,25;
  13:18;14:9;15:20;
  16:22;21:14;28:3
**exercising (1)**
  35:24
**exhibits (1)**
  45:6
**existing (1)**
  12:19
**expand (1)**
  18:20
**expert (7)**
  15:9;18:6,25;20:5,
  20,20;43:20
**experts (1)**
  20:19
**expert's (1)**
  15:17
**explained (1)**
  27:2
**extent (1)**
  35:2

---

**F**

**F3d (1)**
  27:11
**fact (12)**
  12:5,8;14:24;20:2;
  24:1;34:4;36:20,22;
  38:15;41:25;45:18;
  47:24
**factor (9)**
  32:3,15,15;33:3,3,
  11,13;42:19,20
**factors (3)**
  9:24;28:14,19
**factory (12)**
  9:8;29:6,18;30:25;
  31:17,23;32:1,22;
  42:14;45:4;46:7;47:8
**facts (3)**
  8:25;46:4;47:9
**factual (4)**

8:12;21:17;25:8;
  38:8
**factually (1)**
  37:6
**fair (1)**
  12:3
**faith (3)**
  7:15,22;8:1
**fake (1)**
  40:8
**false (1)**
  40:13
**family (1)**
  39:1
**far (4)**
  7:4;9:22;15:8;44:3
**favor (6)**
  5:3,20,22;8:22;
  28:15;33:14
**favorable (2)**
  27:14,16
**favors (1)**
  6:2
**federal (2)**
  6:6;44:8
**feel (1)**
  5:17
**fees (2)**
  17:11,12
**field (1)**
  17:23
**fighting (1)**
  32:13
**filed (9)**
  12:6;13:4;24:13;
  26:10;32:11,21;
  38:22;49:2,7
**files (1)**
  17:23
**filing (8)**
  11:7;13:7,9;38:24;
  39:5,6;48:4,7
**final (3)**
  4:21;20:5,7
**financial (6)**
  12:17;17:5;19:8;
  26:24;31:18;32:19
**find (1)**
  19:24
**finding (1)**
  21:24
**fine (1)**
  28:20
**firm (1)**
  3:17
**first (9)**
  3:9;4:12;11:4;
  12:16;19:22;24:11;
  26:20;42:19;45:1
**five (1)**
  33:9
**flowing (1)**
  6:9

**fluid (1)**
  16:18
**fly (1)**
  38:6
**focus (1)**
  41:15
**follow (1)**
  6:1
**followed (1)**
  14:4
**follows (1)**
  23:5
**follow-up (1)**
  22:5
**fora (1)**
  7:21
**foreign (26)**
  3:8,22;13:3,5,21;
  21:1,1,15,15;25:14;
  28:13;33:18,20;
  34:12;35:6,7,10;
  36:14;41:20,22;
  42:19;45:19,21,21;
  48:25;49:18
**forever (2)**
  22:17;23:13
**Forget (1)**
  32:24
**forth (3)**
  4:3;7:10;8:18
**forum (1)**
  37:19
**forward (1)**
  36:6
**found (12)**
  23:3,10;24:24,24,
  25;26:13,14;27:4;
  28:18;32:22;38:5;
  39:4
**four (1)**
  17:1
**Fox (1)**
  3:16
**France (1)**
  24:6
**frankly (2)**
  20:22;44:16
**fraudulent (1)**
  46:12
**front (2)**
  18:15;35:18
**full (2)**
  8:21;12:3
**fundamental (2)**
  16:1,3
**funds (13)**
  6:5,9;9:9,11;10:3;
  11:5,12,14,15,18,19;
  15:7;16:5
**further (1)**
  43:13
**future (7)**
  11:6;12:18,19,23,

24;33:1;42:22

---

**G**

**game (1)**
  45:14
**Gavva (59)**
  3:8;6:15;8:8,11,11;
  10:13,24;16:7,13;
  17:3,8,8,14,19,25;
  18:10,18;19:8,25;
  20:13,15,16;21:20;
  22:1,3,19,22,23;
  23:11,13;24:12,20,21;
  25:12;26:11,23,23;
  27:6;28:11,13,25;
  32:19,20,23;33:18;
  34:4,6,13,23,25;35:8,
  19;36:6;41:18,23;
  42:4,9;44:22;49:3
**Gavva's (11)**
  5:21;7:5;18:21;
  23:10;26:8;27:19;
  29:3;33:22;34:15;
  35:17;42:5
**general (4)**
  8:4;22:3;23:1,4
**gets (1)**
  9:4
**gist (2)**
  6:12;7:9
**gives (3)**
  12:3;19:13;44:22
**giving (2)**
  4:20;18:10
**glad (1)**
  28:22
**Glenn (4)**
  13:19,23;14:3;15:5
**Glenn's (2)**
  11:10;13:15
**goes (1)**
  42:18
**Golden (6)**
  3:5,22;48:17,25;
  49:7,17
**Good (6)**
  3:10,15,20;7:12;
  8:1;21:12
**Google (1)**
  5:12
**governed (1)**
  9:13
**government (1)**
  6:6
**grant (2)**
  43:9;44:20
**granted (2)**
  14:1;47:19
**granting (1)**
  15:24
**grants (1)**
  34:15

In Re: Aleksandr Vitalievich Sabadash    November 14, 2023

**gravity (3)**
30:23,24;31:14
**greater (1)**
19:12
**Greene (1)**
27:10
**ground (1)**
23:3
**grounds (6)**
22:14;23:2;27:3,5,
5;34:25
**guess (1)**
34:9

**H**

**habitual (2)**
25:21;40:1
**half (1)**
39:14
**handed (1)**
34:1
**hands (1)**
11:16
**happen (5)**
12:18,19,23,24;
43:24
**happened (4)**
7:19;15:3;21:4,6
**happening (2)**
4:24;26:22
**happy (1)**
4:5
**hard (1)**
30:8
**hear (4)**
6:23;10:7,13;28:6
**heard (2)**
12:4;37:5
**hearing (9)**
8:4;9:22;10:9,11;
14:11;48:3,13,15;
50:2
**hearings (1)**
48:11
**held (1)**
11:16
**help (2)**
23:23;24:8
**hence (1)**
5:23
**Here's (1)**
38:22
**hey (2)**
38:25;39:11
**high (1)**
6:10
**highlight (1)**
14:18
**highlights (1)**
18:6
**Hills (4)**
8:13;9:7;49:4,16

**himself (2)**
38:25;39:23
**hinder (1)**
15:25
**hire (1)**
17:19
**holding (1)**
45:4
**honestly (1)**
27:6
**Honor (66)**
3:10,15,20;4:9;
6:20;7:2;10:15,23,25;
11:2,4,23;12:11,12;
13:1,14;14:11,13,21,
23;15:2;16:17,21;
17:14;18:8;19:15;
20:18;21:3,12;31:2;
33:8;37:1,14,24;38:5,
21;39:14,23;40:3,21,
25;41:14;42:3,11,13,
18,24;43:6,8,15,18;
45:22;46:9;47:9,13,
16,23;48:20,21,23;
49:1,11,15,23,25;50:4
**Honor's (2)**
21:16;44:11
**Howard (13)**
3:19,20,21;6:20,24;
7:1,2;48:21,22,23,24;
49:25;50:5

**I**

**impinge (1)**
15:23
**import (1)**
15:23
**important (9)**
11:8;12:11;13:1,14,
20;21:2,19;41:15;
42:20
**imprisoned (3)**
39:12;41:8;48:1
**improper (2)**
20:10;22:14
**inartful (1)**
13:25
**Inc (1)**
27:10
**incarcerated (4)**
8:14;38:9;46:16;
47:2
**incarceration (1)**
38:10
**incentive (1)**
47:6
**inclined (2)**
5:20,22
**including (3)**
17:20;39:8;43:24
**inconsistent (4)**
8:9;38:1,1,4

**incorporation (2)**
36:1;46:21
**incorrect (1)**
34:21
**indefinitely (3)**
39:12,21,24
**indicated (1)**
7:4
**indirect (6)**
9:14;29:6;30:6,17;
49:13,17
**indirectly (2)**
32:7;42:15
**individual (2)**
44:16;47:2
**individuals (1)**
25:21
**indulgence (1)**
47:15
**influence (1)**
4:25
**inform (1)**
13:22
**information (1)**
9:21
**inheritance (1)**
27:16
**initial (1)**
17:6
**inquiry (1)**
37:17
**insofar (1)**
30:25
**instances (1)**
30:7
**intend (3)**
39:1,12,21
**intended (4)**
4:4,5;25:17;31:11
**intends (2)**
24:18;39:23
**intent (7)**
25:16,18,24;26:4,6;
39:15;43:2
**interest (12)**
8:16;9:1,16,23;
21:18;25:20;30:22;
31:14;33:14;45:14;
49:13,16
**interesting (1)**
44:12
**interpretation (1)**
6:2
**interpretations (1)**
46:1
**intimations (1)**
5:1
**into (7)**
6:11;9:4;11:16;
14:10;31:10;44:5;
45:8
**invasion (1)**
16:4

**investigate (1)**
19:10
**investigation (1)**
19:22
**involved (3)**
7:18;29:21;32:14
**involving (2)**
34:7;44:15
**isolation (1)**
6:7
**issue (33)**
5:8,21,24;6:13;8:6;
10:9;11:10,12;12:22;
15:1,16,19;17:2;20:8,
9,11,21,23;21:2,17;
22:8,23;23:8;25:16;
33:19;37:8;40:14;
43:25;44:1,12,12,19;
48:14
**issued (2)**
21:24;36:10
**issues (17)**
5:19;6:14;7:12;9:3,
4;14:10,15,19,24;
20:11,18,19;21:10,15;
23:9;34:7;44:9
**Itkin (3)**
3:25;8:20;33:10
**Itkin's (3)**
33:9;42:21,21

**J**

**jail (6)**
5:5;8:14;24:15;
36:7;46:17,18
**jotted (1)**
10:20
**Judge (10)**
11:10;12:21;13:15,
19,23;14:3;15:5;
16:12;23:21;26:16
**judgment (4)**
15:15;16:7,9;43:23
**judgments (4)**
8:22;15:14;18:1;
33:19
**judicial (13)**
5:18;8:7;12:13;
21:1;23:13,15,19;
24:20;28:3;37:3,5,25;
38:6
**July (6)**
24:13,15;37:14,22;
38:2,15
**jurisdiction (17)**
16:15;21:23;22:4,
15,17,21;23:1,2,3,4;
24:5,7,10;25:12;
37:12,12;44:8
**jurisdictional (3)**
20:12;27:3;37:18
**jurisdiction's (1)**

8:19

**K**

**keep (3)**
14:15,16;48:6
**keeping (1)**
36:1
**Keith (1)**
3:15
**Keosian (1)**
23:22
**kind (4)**
21:5;31:14,17;33:8
**Kirpichev (2)**
18:6;19:18
**knows (2)**
26:23;41:3

**L**

**lack (4)**
8:1;22:15;25:11;
34:11
**lacks (1)**
17:3
**laid (1)**
14:5
**language (3)**
18:2,7,8
**larger (1)**
33:10
**Larry (1)**
10:18
**last (3)**
7:2;44:19;45:23
**later (5)**
8:14;26:19;27:4,15;
39:22
**latter (1)**
46:9
**law (37)**
3:17;4:17;5:11;6:1;
8:19;9:14;19:16;
20:11;23:1;26:3;27:5,
5;28:16;31:12;33:5,
17,20,25;34:3,8,13,
14,15,17,19,20,25;
35:4,5;37:15;38:4;
41:23,23;44:7,8,9;
46:25
**laws (3)**
19:2;27:15,16
**law's (1)**
35:3
**lawsuit (5)**
32:6;33:2;34:5;
37:19;45:11
**lawyer (1)**
36:10
**lawyers (1)**
27:2
**layers (1)**

9:15
**leaning (1)**
  10:6
**least (7)**
  7:18;8:21;9:20;
  30:25;38:9,12;47:6
**leave (1)**
  40:9
**left (2)**
  19:7;33:25
**legal (2)**
  20:19;37:10
**less (2)**
  12:2,3
**level (1)**
  7:21
**levy (2)**
  19:24;45:13
**life (2)**
  41:5,9
**likelihood (1)**
  38:16
**Limited (11)**
  3:23;14:16;17:10;
  29:15,16;31:25;33:1;
  34:5;48:25;49:9,18
**limiting (1)**
  44:21
**line (2)**
  9:19;32:8
**lines (1)**
  30:8
**list (1)**
  32:25
**literal (1)**
  33:12
**litigated (2)**
  37:21;38:23
**litigation (23)**
  7:20;12:7;13:3;
  23:16,18;26:19,25;
  27:17;29:19,25;
  32:14;42:21;44:24,
  25;45:1,2,3,15,15;
  47:5,5,7,16
**little (2)**
  6:22;14:20
**live (3)**
  25:18;38:25;40:5
**lived (3)**
  24:17;41:9,10
**lives (3)**
  26:12,24;27:1
**living (1)**
  25:10
**LLC (1)**
  27:11
**local (1)**
  35:25
**located (3)**
  31:22;32:15;49:4
**locating (1)**
  17:24

**location (7)**
  8:15,18;9:1,5,6;
  29:7;38:16
**locus (1)**
  46:3
**Loeb (4)**
  3:11,11;10:24,24
**logical (1)**
  42:11
**long (1)**
  35:15
**longer (1)**
  12:20
**look (20)**
  5:12,13;8:24;11:9,
  21;15:5,22;24:22;
  25:21;27:20;28:6;
  32:5,5,8,11,12,13;
  33:15;36:18;39:23
**looked (1)**
  36:13
**looking (2)**
  8:17;31:8
**loose (1)**
  38:11
**LOS (1)**
  3:1
**lost (2)**
  24:19;26:7
**lot (4)**
  4:23;5:7;8:3;43:6
**lots (3)**
  7:20;9:13;12:6

## M

**mailing (1)**
  23:6
**main (17)**
  8:16;9:1,15,23;
  21:1,15,18;25:14,20;
  28:13;30:22;31:14;
  33:14;35:6;42:19;
  45:19,21
**maintenance (1)**
  36:2
**makes (2)**
  14:12;48:12
**making (2)**
  29:23;35:1
**manager (5)**
  12:17;17:5;19:8;
  26:24;32:19
**mandate (1)**
  26:10
**mansion (1)**
  9:7
**many (4)**
  5:19;12:6;15:10;
  35:8
**Maps (1)**
  5:12
**March (4)**

21:24;24:9;39:10,
11
**Marilyn (3)**
  27:10,12,23
**market (1)**
  35:25
**Markus (1)**
  11:11
**Marriage (1)**
  37:16
**matter (11)**
  3:8;4:18;7:7;8:12;
  15:20;20:1;24:13;
  27:24;38:4;48:5;50:3
**matters (2)**
  4:23;9:17
**may (11)**
  12:25,25;16:24;
  21:3;22:6;37:1;40:4;
  42:22;46:19;48:14;
  49:12
**maybe (11)**
  7:2;9:12,13;19:22,
  23;25:3,4;32:7;42:22,
  23;46:14
**McClure (1)**
  29:23
**mean (6)**
  8:2;11:15;15:3,6;
  16:3;46:16
**meets (1)**
  6:10
**mention (2)**
  4:23;48:17
**mentioned (7)**
  7:23;13:15;24:8;
  25:15;28:23;44:3;
  49:21
**messing (1)**
  4:7
**met (2)**
  45:19;47:10
**mic (1)**
  6:21
**Michael (1)**
  3:16
**might (8)**
  5:14;6:20;12:15,18,
  19;46:14,14;48:14
**Milton (1)**
  27:10
**mind (3)**
  14:15,16;38:12
**minute (1)**
  17:14
**misled (3)**
  23:22,22;31:7
**misspoken (1)**
  49:12
**misstatement (1)**
  34:10
**misunderstanding (1)**
  21:3

**mix (1)**
  30:12
**moment (1)**
  3:14
**Money (3)**
  33:20;34:12;45:8
**monies (1)**
  12:15
**monopolize (1)**
  35:9
**Monroe (3)**
  27:11,12,23
**months (1)**
  27:3
**more (16)**
  6:11;9:1,5;14:12,
  20;16:3;24:24;27:16;
  28:6;29:17;36:1;
  37:22;38:18;39:17;
  42:16;46:9
**Moscow (6)**
  6:18;7:6,7;9:9;
  46:16,17
**most (3)**
  14:24;16:1;27:6
**motion (8)**
  3:6;21:23;22:14,15;
  23:2,9;26:9;28:19
**motions (2)**
  12:6;48:11
**movant (1)**
  41:21
**move (3)**
  23:25;24:14;26:25
**moved (3)**
  13:4;25:5;26:8
**moving (2)**
  24:6;38:13
**much (3)**
  10:19;30:14;44:23
**must (2)**
  22:16;35:19
**myself (1)**
  4:20

## N

**name (1)**
  10:20
**narrow (2)**
  5:25;6:2
**narrowly (1)**
  11:24
**nature (1)**
  4:12
**need (7)**
  6:25;10:1;20:4;
  21:14;28:6,19;44:15
**needed (1)**
  42:16
**needs (2)**
  15:22;43:21
**neutral (1)**

33:11
**New (9)**
  11:11;15:2;27:14,
  14,23;39:18,20;
  44:17;49:8
**news (1)**
  4:24
**Next (1)**
  4:23
**ninety (2)**
  45:6;47:7
**Ninth (2)**
  27:11,22
**nobody (1)**
  5:5
**None (3)**
  32:18;36:2,11
**nonmain (8)**
  9:16,24;21:1,15;
  35:7,10,18;45:21
**non-news (1)**
  4:24
**nontransitory (1)**
  35:21
**noodling (1)**
  14:20
**normally (1)**
  4:19
**note (1)**
  42:20
**nothing's (1)**
  25:7
**notice (1)**
  5:18
**NOVEMBER (1)**
  3:1
**nowhere (1)**
  32:22
**number (4)**
  8:15;15:16;17:17;
  23:20
**numerous (1)**
  7:20

## O

**oath (1)**
  41:9
**objection (1)**
  49:21
**obtain (3)**
  13:11;17:4;34:23
**obtained (1)**
  19:7
**obviously (1)**
  23:24
**occur (1)**
  12:7
**October (3)**
  17:16;18:2,16
**off (4)**
  6:9;9:11;16:5;
  32:13

In Re: Aleksandr Vitalievich Sabadash

November 14, 2023

oligarch (1)
    5:3
once (2)
    23:21;24:23
one (30)
    3:14;5:21;9:2;14:2;
    15:17;17:2,14;20:17,
    20;23:15,16,20,24,24;
    24:1,1;26:18,20;
    30:14;31:10;32:17;
    33:9,13;36:7,9;38:2;
    40:24;42:10;43:11;
    47:6
online (1)
    3:19
only (20)
    11:6,7,9,25;14:6;
    16:5,12;29:20;30:17;
    32:17;33:17,24;36:4;
    39:11;41:20;42:6;
    47:3,5,19,20
oOo- (1)
    3:2
open (1)
    14:15
operations (1)
    35:20
opportunity (3)
    12:3,4;13:23
opposed (3)
    22:22;26:11;27:8
opposing (2)
    37:6,8
opposite (1)
    23:17
opposition (3)
    42:4,13;43:3
oral (9)
    4:5,20;6:12;9:2;
    10:7,10,12;14:11;
    48:14
order (22)
    3:3;18:13,13,14,15,
    15,18;19:4,6,11,12,
    23;20:4,6;21:24;
    39:10,17;43:13;44:2,
    2,3,4
orders (3)
    7:6;19:2;42:1
original (1)
    19:12
Oscar (1)
    10:17
others (1)
    44:21
otherwise (4)
    25:10,13;36:15;
    40:17
out (15)
    4:22;5:3;6:21;14:5;
    16:1;23:23;24:8;
    25:11;26:19;27:3;
    33:24;35:20,24;

39:14;45:25
outlets (2)
    4:24,24
outright (1)
    5:2
outset (1)
    43:15
outside (3)
    5:10;9:8;36:11
over (13)
    20:25;21:9;22:4;
    23:1,4;24:5;37:4,13;
    40:15,25;41:12;45:3;
    49:19
overseas (2)
    43:23,23
Owens (13)
    3:15,15;14:22,23;
    17:1;43:18;45:24;
    46:9,23;47:12;48:20,
    22;50:4
own (13)
    4:14;29:3,16,17,25;
    32:1,7,10;39:4,20;
    42:17;47:7,24
owned (3)
    42:14,14;49:8
owner (1)
    30:6
ownership (16)
    9:14;29:6;30:6,17,
    19,19,20,21;31:19;
    36:2;45:14;46:5,6,7;
    49:13,14
owning (1)
    31:15
owns (7)
    29:18;31:16,16,24;
    45:4,6;49:3

**P**

PACER (1)
    40:7
page (1)
    4:15
paid (1)
    17:11
paper (1)
    4:15
papers (20)
    5:1,9;7:11;10:6,20;
    14:17,19;25:22;28:7;
    37:15;41:16;43:3;
    44:13;45:5;47:24;
    48:5,7;49:2,7;50:2
part (6)
    15:18,18;25:15;
    29:15,20;32:14
particular (4)
    5:22;14:18;43:9;
    46:4
parties (8)

4:1,7;5:9,17;8:18;
    12:4;28:17;48:6
parties' (1)
    7:20
partly (2)
    4:12,13
parts (2)
    4:11;7:20
party (4)
    18:5;23:15;42:10,
    10
party's (1)
    24:22
past (1)
    41:10
pay (2)
    5:9;17:12
pellet (2)
    45:4;47:8
penalty (1)
    40:7
pending (5)
    12:6;15:5;20:2,4,6
perceive (1)
    30:24
percent (8)
    30:19,20,20;31:15,
    16,17;45:6;47:8
perfectly (1)
    26:16
perhaps (2)
    7:7;9:10
periods (1)
    8:9
perjurious (5)
    40:13;41:2,4,7,8
perjury (3)
    40:7;41:6,11
permitted (1)
    28:11
person (5)
    18:20;19:21;23:4,5;
    46:16
personal (4)
    4:14;22:15;25:11;
    37:12
perspective (1)
    30:3
persuasive (3)
    6:2;8:8;14:6
petition (8)
    5:23;17:4;20:15;
    26:10;32:11,21;
    35:21;37:23
petitioner (1)
    20:15
phonetic (1)
    29:23
physical (4)
    25:24;26:3,6;38:16
physically (1)
    22:19
picture (1)

5:13
piece (1)
    4:15
pierce (1)
    47:3
piercing (1)
    45:12
Pirogova (2)
    32:9;36:14
place (4)
    12:20;23:24;24:1;
    35:19
places (1)
    23:21
plain (2)
    31:13;41:6
plaintiff (2)
    29:22;30:1
plan (2)
    10:8,10
please (3)
    4:4;10:16;37:2
PM (5)
    3:1;48:10,19;49:22;
    50:7
podium (1)
    14:12
point (16)
    8:2;14:18;22:9;
    27:10,15;29:9;36:16;
    37:21;38:2,3;40:24;
    41:7;42:22;43:19;
    45:23;48:5
pointed (1)
    39:14
points (1)
    4:16
policies (1)
    16:1
policy (21)
    5:24;6:3,6,11;10:2;
    11:1,2,22,24,25;12:1,
    2;13:18;14:9;15:1,20;
    16:18,22;21:14;
    43:14;44:12
portions (1)
    6:18
position (19)
    5:21,23;14:25;
    21:21;23:16,17;
    24:16,21,22,23,23;
    25:1,2;26:8;27:8,13,
    23;28:9;29:9
positions (2)
    38:1,4
possibly (2)
    9:9,22
posting (1)
    4:3
potential (1)
    12:15
potentially (2)
    12:17;47:3

power (2)
    36:9;46:24
powers (2)
    5:3;44:21
prelude (1)
    5:19
premature (1)
    12:21
prepared (1)
    4:19
presence (4)
    25:24,24;26:4,6
present (1)
    12:15
presented (3)
    5:9,17;30:18
presumably (1)
    24:3
presumption (3)
    21:18;28:10;39:25
pretend (1)
    33:1
pretty (2)
    6:8;30:11
prevail (2)
    26:17;33:10
prevailed (5)
    21:21;22:23;24:20,
    23;25:1
previous (2)
    32:12;33:24
previously (1)
    13:25
pride (1)
    4:20
principal (5)
    19:19,20;20:8;42:6;
    44:5
principle (2)
    5:16;26:17
principles (1)
    34:20
prior (4)
    18:17;37:23;38:24;
    44:4
probably (10)
    6:10,19;7:6,10,23;
    8:13;9:4;14:12,14;
    48:12
problem (1)
    18:12
proceed (4)
    6:16;20:14;22:12;
    34:24
proceeded (1)
    34:14
proceeding (27)
    6:16;8:10;9:16,24;
    10:3;11:25;12:9;13:7,
    17;16:9;21:1,15;22:2,
    7;25:14;28:14;35:6,7,
    11;41:18,21,24;45:19,
    21,22;47:18,18

**proceedings (6)**
5:1;15:13;16:6;
22:7;35:19;50:7
**professional (1)**
17:24
**Professor (1)**
17:18
**profitable (1)**
9:11
**profits (1)**
9:11
**prong (1)**
36:16
**proof (2)**
28:24;35:17
**proper (3)**
22:8;37:11;49:19
**property (6)**
9:7;49:4,8,9,17,19
**prosecute (1)**
34:11
**protect (3)**
43:14,14;44:21
**protects (1)**
23:19
**prove (2)**
24:23;36:16
**provided (1)**
44:4
**provision (1)**
19:1
**public (19)**
5:24;6:3,11;10:2;
11:1,2,22,23,24;12:1;
13:17;14:9;15:1,20;
16:17,22;21:14;
43:14;44:12
**pure (2)**
33:19;35:4
**purported (1)**
18:20
**purportedly (1)**
19:21
**purpose (2)**
13:8;16:8
**purposes (12)**
8:10;16:1;25:19;
29:4,7;30:22;31:8,15,
19;32:3;37:18;39:25
**pursue (6)**
16:9;18:23;19:9,14,
22,24
**pursued (1)**
46:12
**pursuing (1)**
16:7
**put (5)**
8:18;17:21;26:16;
31:20;36:5
**puts (1)**
36:6

## Q

**quash (4)**
21:23;22:14;23:2,9
**quick (1)**
40:24
**quickly (1)**
41:17
**quintessential (1)**
23:15
**quite (3)**
4:19;9:10;38:11
**quote (2)**
17:15;37:18
**quoted (3)**
6:17;18:7;44:4

## R

**raise (1)**
11:9
**Ran (1)**
32:9
**re (5)**
11:10;29:23;32:9,9;
37:16
**reach (1)**
28:19
**reached (1)**
4:8
**read (1)**
4:14
**reading (2)**
18:8;31:13
**real (3)**
5:11;35:16;46:11
**realized (1)**
27:15
**realizing (1)**
18:12
**really (17)**
4:20;9:1;11:10;
15:19;28:23;30:6,14;
34:6;35:6;43:25;44:1,
9,23;45:11;47:3,5,6
**reason (2)**
13:2,2
**reasons (2)**
7:10;11:3
**recap (1)**
6:25
**reciprocity (1)**
15:16
**recital (1)**
18:9
**recites (1)**
18:4
**recognition (24)**
3:6;5:23;11:6,20,
22,23;12:14,22;13:9,
16,17,22,25;14:8;
15:22;32:11;33:21;

34:12,23;35:22;
41:21;43:9;44:20;
47:19
**recognize (3)**
10:2;14:16;45:19
**recognized (2)**
15:13;33:19
**recognizing (1)**
4:11
**reconsideration (1)**
26:8
**record (18)**
5:14;7:14;8:2;
28:23;29:1;30:18;
31:3;32:19;33:15;
35:17;36:1,19,19,21;
38:19;42:12;45:17;
49:11
**records (1)**
30:12
**recover (1)**
42:16
**recovered (1)**
43:12
**referred (1)**
12:12
**referring (1)**
40:6
**regardless (1)**
41:25
**relate (2)**
24:10;46:6
**relates (1)**
46:7
**relatively (1)**
15:2
**release (1)**
15:6
**relevant (3)**
5:15;37:17;38:14
**relied (2)**
38:23;39:3
**relief (2)**
43:8;48:11
**relies (1)**
40:11
**rely (5)**
19:15;32:9;39:22;
40:1;44:7
**remain (10)**
24:18;25:25;26:4,6;
39:1,12,15,21,24;43:3
**remember (2)**
4:6;30:12
**remote (1)**
46:8
**removed (1)**
29:17
**render (1)**
17:20
**rendition (1)**
18:9
**repeat (1)**

40:20
**repeatedly (1)**
12:5
**reply (3)**
34:4;36:24;37:15
**report (2)**
29:3;32:21
**represent (2)**
3:17;49:5
**representative (6)**
3:8;13:3,6,21;
16:14;41:22
**representatives (3)**
3:22;48:25;49:18
**representing (1)**
26:18
**require (2)**
9:5;42:2
**required (3)**
19:4;41:19;42:2
**requirement (4)**
13:21;19:4;41:22;
43:21
**requirements (1)**
41:15
**requires (3)**
18:25;19:6;41:20
**requisite (1)**
17:4
**reside (1)**
25:13
**resided (2)**
21:7;41:5
**residence (5)**
8:12;22:20;23:7;
25:21;40:1
**residing (2)**
8:13;22:10
**resolution (2)**
4:8;36:8
**resolved (2)**
20:21,22
**respect (14)**
11:22;13:19;15:1;
16:17,20;20:24;
41:14;42:12,18,24;
44:11;47:16,16,23
**respond (1)**
38:21
**response (1)**
4:2
**rest (2)**
33:16;37:4
**retain (3)**
17:9,14;18:11
**retained (2)**
18:5;19:10
**returning (1)**
38:17
**reviewed (3)**
4:16,17,17
**reviewing (1)**
14:19

40:20
**Ricky (1)**
10:18
**right (20)**
3:4;4:2;7:8;8:6;9:8;
14:14;17:16;18:11,
15,22;19:9,10,14;
20:14;22:17;29:12;
30:12;33:7;39:25;
40:19
**rights (5)**
15:24;16:2;18:18,
22;19:12
**rise (1)**
7:21
**Ronald (2)**
3:20;48:23
**Rothschild (1)**
3:16
**ruling (12)**
4:5;6:12;9:2;10:10;
17:7,17;18:3;21:13;
28:21;48:9,14,15
**rulings (4)**
4:4,21,21;6:18
**running (3)**
46:18;47:25,25
**Russia (72)**
5:1;6:7;9:12,18;
11:12,15,20;12:16,17;
13:12;15:7,10,15;
16:19;17:6;19:2;
22:19,22;23:18;24:6,
14,17,18,18;25:13,17;
26:6,12;28:15,16,22,
25;29:2,7,8,13,14,19;
30:25;31:19,23;
32:18;33:5,5,7,15;
34:5;35:20,25;36:9,
11,12,20,22;38:12,13;
39:12,13,21,24;41:5,
8,9;42:16;43:4,5,22;
44:8;45:18;46:7;47:9;
48:1
**Russian (47)**
6:4,5,9,18;7:5;8:14;
9:14;10:4;12:2,9,9,16,
18;13:13,17;15:13;
16:6,18,20;17:5;
19:16,22;20:7,9,11,
22;27:5;29:17;32:21,
24,25;34:1,3,7,15,17,
19,21;35:3,4,5;41:17,
24;42:1;44:16;45:4;
47:21
**Russia's (1)**
16:4

## S

**Sabadash (79)**
3:6,8,14,17;5:5;
7:16;8:11;12:5;13:4,
10;21:7,21,25;22:1,3,

4,9,13,18,23;23:2,10,
12,16,18,20;24:12,14,
15,19;25:1,5,9,13,17;
26:5,8,10,14,23;27:1;
28:1,20,25;29:12,13,
16,19;30:17,19;31:5,
15;33:2,18;34:6,7,13,
14,16,17;35:19,24;
36:7;38:8,24;39:8,16,
23;40:5,8;41:4;42:14;
43:4,11;44:21,25;
49:3,16,17
**Sabadash's (11)**
5:22;22:22;23:14;
24:16;28:9;31:18;
32:20;36:10;39:4,20;
47:24
**Sam (1)**
10:17
**same (11)**
5:16;25:7,18,23;
26:19;30:14;32:20;
38:18;40:12;48:13,18
**sanctioned (1)**
16:18
**sanctioning (1)**
16:19
**sanctions (2)**
12:20;44:17
**satisfy (3)**
36:3;46:15;47:1
**saying (8)**
13:5;26:12;31:7;
39:11,21;41:5;46:1,4
**scenario (2)**
46:11,14
**schedule (1)**
4:14
**Schuyler (2)**
3:10;10:23
**searching (1)**
17:20
**seated (1)**
4:4
**second (8)**
4:3;15:18,21;22:15;
26:21;42:7,19;45:2
**secondary (1)**
23:8
**seconds (1)**
7:3
**section (4)**
7:8;13:20;28:10;
41:20
**seek (2)**
18:12,23
**seeking (3)**
15:15;41:21;47:19
**seem (3)**
7:21,25;8:25
**seems (9)**
6:9,14;7:5,9,12;8:7;
9:15;31:18;48:12

**Segal (4)**
3:21,21;48:24,24
**self-serving (1)**
40:13
**sense (5)**
10:6;14:12;42:11;
45:8;48:12
**sentences (1)**
19:17
**series (1)**
44:17
**serve (1)**
22:20
**served (1)**
23:6
**service (14)**
8:10;18:7;22:8,9,
14,14,18,20;23:8;
37:8,9,10,13;39:18
**services (1)**
17:20
**set (2)**
4:3;7:10
**Seventh (1)**
26:17
**several (5)**
4:11,12;9:15;11:3;
27:3
**severely (2)**
15:23,25
**shareholder (2)**
31:24;36:7
**shares (5)**
42:15;45:3,5;46:6;
47:17
**shot (1)**
16:16
**show (7)**
28:14;30:11;35:18,
19,23;36:3;38:19
**showing (1)**
45:20
**shows (3)**
27:21;36:19,21
**side (6)**
7:14,15,17;8:2;
28:6;29:5
**signature (1)**
40:8
**signed (1)**
36:7
**similar (2)**
11:17;27:19
**simple (1)**
41:6
**simply (4)**
18:4,17,19;44:4
**single (2)**
40:5,15
**siphoned (1)**
9:11
**sit (1)**
45:22

**situation (2)**
15:3;46:10
**slim (2)**
38:17,18
**solely (1)**
11:20
**Solyar (1)**
10:14
**somehow (2)**
12:1;47:2
**someone (1)**
7:16
**someone's (1)**
4:25
**someplace (1)**
23:25
**sometime (2)**
32:7;33:1
**sometimes (3)**
31:9;38:10;48:5
**somewhat (1)**
38:17
**soon (1)**
48:14
**sorry (5)**
27:13;31:6;34:22;
39:17;48:22
**sort (5)**
12:11;14:24;17:23;
30:23;45:13
**sorts (1)**
5:21
**sought (2)**
18:13;19:6
**Southern (1)**
11:11
**specific (2)**
19:1;42:13
**specifically (3)**
17:8;19:3;31:21
**speculation (1)**
45:16
**spell (1)**
10:16
**Sphinx (6)**
3:5,22;48:17,25;
49:7,18
**stand (1)**
28:9
**standard (7)**
5:10;6:10,10;7:24;
15:21;21:13;22:13
**standing (17)**
6:15,19;7:5,7,10;
16:13,13;17:2,3;19:8;
20:12,13,23;27:4;
34:11,16;41:14
**start (3)**
3:7;4:11;17:25
**started (1)**
36:18
**starting (1)**
40:18

**starts (1)**
28:24
**state (44)**
4:1;5:14,15;12:24;
13:4,5,10;15:12;16:8;
21:4,6,7,8,20;22:1,3,
16;24:9;25:8,9,23;
26:3,7,9;34:10,22,24,
25;35:3;37:7,14,19,
22;38:24;39:3,5,7,9,
10,18;40:14;41:5,6;
43:1
**statement (4)**
29:24;39:15;41:4;
49:2
**statements (4)**
5:2;38:23;39:4;
42:17
**States (11)**
6:7;15:23,25;17:18;
18:1,23,24;19:10,14;
35:22;43:24
**stating (1)**
43:21
**status (5)**
3:5,6;15:12;48:9,18
**statute (5)**
17:10;31:13;41:16,
19;42:2
**statutory (1)**
15:24
**stay (4)**
20:2,4;43:12;48:12
**stayed (1)**
42:22
**step (1)**
15:10
**stick (1)**
5:8
**sticking (1)**
5:16
**still (6)**
6:8;9:15;22:8;
28:20;34:20;40:8
**stole (1)**
31:25
**Stolyar (14)**
3:11;10:15,15,16,
17,21;37:1,3;38:21;
40:6,11,13,24;41:2
**story (2)**
24:19;26:15
**straight (1)**
33:25
**strategic (1)**
26:25
**stuck (2)**
25:2;26:18
**style (1)**
48:7
**subject (1)**
43:13
**submission (2)**

10:8;48:3
**submit (1)**
40:23
**submitted (9)**
15:8;32:21;39:8,10,
16;41:4;43:20;45:17;
50:3
**subsequent (2)**
18:14;23:17
**subsidiary (1)**
49:9
**substance (1)**
47:4
**substantial (1)**
8:20
**substantive (3)**
17:1;30:4,10
**substitute (4)**
22:19,20;23:6;
37:10
**sufficient (2)**
7:6,13
**suggests (1)**
38:12
**suit (3)**
26:17,20,21
**summons (1)**
23:6
**supplemental (1)**
19:18
**support (1)**
29:21
**suppose (1)**
46:10
**supposed (1)**
19:12
**sure (3)**
4:6;35:14,16
**sustained (1)**
34:11
**swallow (1)**
33:10
**swirling (1)**
5:7
**Swiss (2)**
36:10;46:24
**switch (1)**
27:24
**swore (1)**
40:7
**sworn (4)**
38:23,25;39:15;
41:4

---

**T**

---

**talk (4)**
20:25;31:13;32:10;
48:2
**talked (2)**
4:21;17:2
**talking (2)**
8:8;17:16

---

**tangential (1)**
45:2
**tangible (1)**
46:2
**Tavrichesky (1)**
45:6
**tax (1)**
27:14
**tease (1)**
45:25
**technically (1)**
7:9
**ten (1)**
7:2
**tentative (13)**
4:4,5,20;6:12;9:2;
10:13;11:1;14:5,11;
21:16;28:21;44:11;
48:9
**terms (4)**
12:12;18:3;24:10;
44:13
**test (7)**
25:19;30:11;37:10,
25;39:14;46:15;47:1
**testified (1)**
18:25
**theory (3)**
19:15,16,17
**therefore (4)**
12:22;22:1;37:12;
39:24
**thinking (1)**
14:4
**Thompson (1)**
37:16
**though (2)**
7:7;46:10
**thought (3)**
22:6,8;30:17
**three (1)**
28:14
**threshold (2)**
17:11;20:11
**threw (1)**
33:24
**thrown (2)**
25:11;27:3
**thwart (1)**
16:4
**times (2)**
33:10;38:20
**timing (5)**
12:13,14;23:23;
24:8,13
**today (9)**
9:20;11:5,18;12:22;
20:21;24:15;40:12;
48:16,19
**today's (1)**
50:1
**together (1)**
22:16

**Togut (2)**
3:21;48:24
**told (1)**
34:25
**Tom (1)**
10:17
**took (1)**
27:12
**top (1)**
4:19
**topics (1)**
5:7
**touch (2)**
6:14;8:6
**touched (1)**
10:5
**tough (2)**
27:22;30:11
**towards (1)**
10:25
**Trading (1)**
32:17
**traditional (2)**
5:20;45:9
**transaction (1)**
33:23
**transfer (3)**
45:3;46:6,12
**transferred (2)**
4:13;46:13
**traveling (1)**
38:11
**trial (2)**
39:16;41:11
**tried (3)**
16:11;44:1,2
**trouble (1)**
29:23
**true (5)**
7:17;15:6;26:5,18;
34:10
**trustee (1)**
17:22
**trustees (1)**
15:14
**trustworthiness (1)**
4:25
**try (3)**
4:6;5:8;44:23
**trying (5)**
14:14,15;16:4;44:7;
45:10
**TUESDAY (1)**
3:1
**turn (5)**
20:25;21:9;37:4;
40:24;41:12
**two (11)**
8:9;16:6;23:8,21,
25;32:9;33:8,13;
38:20;42:24;45:25

**U**

**Ukraine (4)**
15:3,11;16:4;44:17
**ultimate (2)**
10:12;12:8
**ultimately (4)**
12:15,17;44:24;
45:14
**uncontroversial (1)**
29:24
**under (17)**
5:20;10:8;13:20;
19:16,23;22:25;
25:23;31:12,12;
34:13,14,19;40:7;
41:9,22,23;48:3
**underlying (1)**
11:25
**understood (1)**
21:16
**undisputed (1)**
31:22
**unfair (1)**
20:9
**unfriendly (1)**
15:12
**ungrant (1)**
13:25
**United (10)**
6:7;15:23,25;18:1,
23,24;19:9,14;35:22;
43:24
**unless (2)**
14:12,17
**unsuccessful (1)**
16:11
**up (6)**
4:7,13;5:12;30:12;
33:11;43:6
**use (1)**
13:24
**used (9)**
5:4;7:24;9:10;
24:22;30:2,5;31:8,25;
32:1
**using (1)**
13:23

**V**

**valuable (2)**
9:8,12
**value (3)**
5:11;15:23;46:11
**various (1)**
4:24
**veil (2)**
45:13;47:4
**versus (1)**
22:7
**view (1)**

4:25
**virtue (1)**
19:11
**VLK (1)**
29:18
**voidable (1)**
33:23
**Vyborg (6)**
29:15,16;31:25;
33:1;34:4;42:14

**W**

**waive (1)**
22:17
**war (4)**
15:3,11,12;44:17
**way (11)**
6:16;8:24;9:2;
11:19;20:5;27:5;28:9;
31:8;36:5,24;38:18
**ways (2)**
8:3,17
**weigh (4)**
8:25;9:5;28:14;
33:14
**weight (1)**
9:17
**welcome (1)**
50:6
**well-reasoned (1)**
14:7
**what's (7)**
7:19;26:21;30:8,8,
23;31:3;41:19
**Whereupon (1)**
50:7
**whole (1)**
16:8
**wholly-owned (1)**
49:9
**who's (3)**
18:5;20:25;30:6
**wife's (1)**
22:20
**win (1)**
26:20
**wins (2)**
32:6;33:1
**wish (1)**
4:1
**without (1)**
9:22
**won (2)**
27:22;40:14
**wondering (1)**
30:16
**Wood (2)**
3:21;48:25
**word (3)**
5:3;7:24;13:25
**words (1)**
39:20

**works (1)**
25:4
**world (1)**
44:17
**worries (1)**
10:21
**worry (1)**
32:24
**wrest (1)**
45:15
**writ (1)**
26:10
**writing (1)**
10:9
**written (1)**
48:14
**wrongful (2)**
7:16;46:5

**Y**

**year (10)**
21:20,24;28:2;
37:22,24;38:14;
39:11,17,17,22
**years (1)**
8:15
**yellow (1)**
10:18
**York (4)**
11:11;27:14,14,23

**Z**

**Zorkin (30)**
3:17,17;20:25;21:5,
9,12;22:11,13;24:2,
12;25:20;28:8;29:12;
30:15;31:2,20;33:7;
35:14,16;37:8;38:7;
40:3,11,17,19,21,23;
41:3;46:22;49:15

**0**

**09 (1)**
46:20

**1**

**1 (2)**
24:9;39:10
**100 (6)**
30:19,20,20;31:15,
16,16
**11th (2)**
17:16;18:2
**12th (1)**
18:16
**13 (1)**
39:11
**14 (1)**
3:1

**15 (8)**
  11:7;13:7;17:3;
  20:15;25:19;37:23;
  45:9;49:10
**1515 (1)**
  41:20
**1516c (1)**
  28:10
**1518 (2)**
  13:20,23
**1713 (1)**
  33:20
**1st (1)**
  21:24

### 2

**2 (3)**
  48:10,19;49:22
**2:49 (1)**
  3:1
**2000 (1)**
  46:19
**2008 (1)**
  28:2
**2012 (1)**
  27:12
**2014 (4)**
  24:16;38:9;41:8;
  46:17
**2016 (3)**
  36:6;46:22,23
**2022 (7)**
  15:3;24:13,15;
  37:14,17,22;38:2
**2023 (7)**
  3:1;18:16;21:24;
  23:11;24:9;35:23;
  38:3
**22 (1)**
  17:7
**22nd (1)**
  38:15
**23rd (1)**
  38:15
**29th (1)**
  35:23

### 3

**33 (1)**
  17:17

### 4

**4:10 (1)**
  50:7
**481 (1)**
  37:16
**487 (1)**
  37:17

### 5

**5 (3)**
  48:10,19;49:22

### 6

**692 (1)**
  27:11

### 7

**7 (1)**
  3:4
**74 (1)**
  37:16

### 9

**9 (1)**
  3:5
**983 (1)**
  27:11